UNITED STATES of America, Plaintiff,

v.

Alfred BRAWER et al., Defendants.

No. 72 Cr. 64 (MP).

United States District Court, S. D. New York.

Nov. 26, 1973.

Paul J. Curran, U. S. Atty., S. D. N. Y., by Robert P. Walton, and Jay Horowitz, Asst. U. S. Attys., for plaintiff.

Alfred I. Rosner, New York City, for defendants Brawer and Ignomirello.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Kreshik, by Kenneth C. Bass. III, Washington, D. C., of counsel.

## FINDINGS AND OPINION

POLLACK, District Judge.

This case is presently on appeal before a panel of the Court of Appeals (Moore, Hays and Feinberg, C. JJ.) following conviction by a jury of all three defendants of knowingly transporting stolen United States Treasury Bills and of conspiring to do so. 18 U.S.C. §§ 2, 371, 2314.

After hearing argument on a wide spectrum of points of the parties, the Court of Appeals ruled that the convictions were grounded on sufficient evidence, that there were no errors in the reception of evidence, that the criticisms of the charge to the jury were without legal merit, and that the government's summation was not ground for reversal. 482 F.2d 117 (2d Cir. 1973). However, before making a final disposition, the Court of Appeals decided to obtain the rulings of the trial judge on questions raised on appeal under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963).

In the course of the briefing of the appeals, the defendants Brawer and Ignomirello suggested—for the first time —that the government might have suppressed allegedly exculpatory evidence in its possession consisting of certain 1969 statements of three Canadians, the grand jury testimony of one of them and some notes made by the prosecutors of talks with the Canadians. This data was not disclosed to the defendants before or during the trial and it is now claimed that the doctrine of Brady v. Maryland required disclosure thereof. The defendant Kreshik echoed this contention in his reply brief.

The questions thus remanded to this Court were "whether the 1969 statements fit the description of 'exculpatory evidence' and whether they should have been made available to defendants". (482 F.2d at 136). The Court of Appeals further directed this Court to "[read] and [consider] such material as the government may have had in its files, [and determine] whether this material falls into the category of exculpatory material which 'in any reasonable likelihood [would] have affected the judgment of the jury'." (Id.)

The Court of Appeals said:

Since we have considered carefully all of appellants' various other contentions on appeal and find them to be without merit, and since we are of the opinion that, absent a finding of improper suppression of material evidence on the Brady issue, the evidence justifies affirmance of the judgments of conviction, we will await both a ruling by the district court on the Brady issue and the expanded record before making a final disposition of this appeal. (Id. at 136–137)

Hearings pursuant to this remand were duly held in the District Court. The parties submitted their documentary proofs and the testimony of defendant Kreshik was taken on direct and cross examination; Brawer had testified on the trial and he and Ignomirello were present at the hearings but did not testify. The three Canadians involved in the statements were no strangers to Ignomirello and Brawer, who knew their identity and location since Ignomirello had met and was present at the negotiations with them. There was no claim that Kreshik had met them and at the hearings he sought to throw off any suggestion that he was aware of them or what had transpired with them. He also attempted to deny knowledge of the stolen character of the Bills.

One fact stands out starkly from the hearings. The testimony of the defendant Kreshik in the post-appeal hearings as to his timely awareness of the Canadians and his connection with the scheme and knowledge of the stolen character of the Treasury Bills was plainly incredible. The demeanor evidence and the reasonable inferences to be drawn from his assertions and denials, in the light of all the facts and circumstances disclosed by the trial and hearing records, render his testimony wholly unworthy of belief on his oft repeated assertion in this Court and in the Court of Appeals that he lacked guilty knowledge of who was involved, what was going on and what he was doing to facilitate the criminal venture.

In addition to taking the evidence adduced at the hearings, the Court has read and considered such material as was contained in the government files, as well as certain other documents, to be discussed at length below, which purport to bear in some way upon the characterization and relevance *vel non* thereof.

Based on the foregoing, and for the reasons indicated hereafter, the Court finds and reports that the 1969 statements and data referred to by the Court of Appeals in no wise fit the description of "exculpatory evidence" as defined in *Brady* and its progeny.

It is amply evident that in no reasonable likelihood would the disclosure of the questioned statements have affected the verdict of the jury or provided any unknown or unappreciated opportunities to weaken the government's case or to have had an effect on the verdict.

Accordingly, there is no reason why the questioned statements should have been turned over to defendants, either prior to or during the trial.

It is clear from a careful perusal of the trial record that the government established a substantial enough case as to each defendant—Kreshik, Brawer and Ignomirello—from which the jury could properly infer their guilt beyond a reasonable doubt, even without the testimony of the witness Maucelli, a coconspirator herein. It is on the question of Maucelli's credibility that defendants base their argument that the 1969 statements are relevant to the present issue. However, since there was a sufficient case apart from his testimony, even assuming both the availability and admissibility of the 1969 statements [each highly questionable at best], defendants' argument is wide of the mark.

### I.

As summarized by the Court of Appeals, the facts of the crime are these. On March 6, 1969, the brokerage house of Francis I. duPont & Co. received at its New York offices $342,000 in six-month United States Treasury Bills, issued that same day. One month later, duPont found these bills to have been taken from its possession. At about the time duPont received the bills, *i.e.*, the first week in March, the defendant Kreshik, a priest, approached a banker named Dembe and sought the latter's assistance in the disposition of $262,000 of these securities. Kreshik stated his requirements: The sale must be abroad, and Kreshik would divulge neither the identity of his principal—a parishioner—nor that person's reason for desiring to

effectuate a foreign sale. Dembe cautioned Kreshik against the possibility that the securities were either stolen or forged. Kreshik responded by personally vouching in all respects for both his principal [1] and the transaction itself, notwithstanding the fact that Kreshik, according to his own testimony, never saw fit to inquire of his principal concerning the latter's possession of negotiable securities in an amount usually traded only by institutions. None of the actors herein at any time possessed, or requested of one another, any documents evidencing ownership of the Bills.

In all events, Dembe eventually agreed, after satisfying himself that the Bills were at least not counterfeit, to put Kreshik in contact with a person "who has some knowledge of securities in foreign markets." This person turned out to be the defendant Brawer, not theretofore known to Kreshik. After Dembe made the introduction, he departed the scene permanently. In due course, Kreshik delivered the $262,000 face amount of Treasury Bills to Brawer although he testified at the hearings that he neither knew nor ever inquired as to Brawer's background, his phone number, his business or where he lived. According to the position taken by Kreshik's appellate counsel, this was the end of Kreshik's involvement in the transaction. As will be treated more fully below, it is abundantly clear from Kreshik's testimony before this Court at the hearing on remand that this position is not supportable, particularly in light of the facts which are now in the expanded record.

Brawer brought Maucelli [1a]—a photographer—into the picture at this juncture, and thereafter employed him as a combination negotiator/messenger until such time as Maucelli was arrested by the FBI. Brawer outlined certain ex-

plicit conditions of the sale to Maucelli. The bills had to be sold abroad, preferably for 90% of the face value, but possibly as low as 85% of face, in what had to be a cash deal, consummated as quickly as possible (within two days at the most), on behalf of but without the disclosure of the identity of the "priest" (Kreshik) for what Brawer intimated might be tax reasons. For their respective parts in the transaction, Brawer and Maucelli were to share equally in 10% of the sales price.

Maucelli promptly telephoned a Canadian, Riel, and arranged to fly to Montreal on Friday, April 11, 1969, after receiving the Bills from Brawer at La-Guardia Airport. Upon his arrival at the airport, Maucelli encountered defendant Ignomirello, who had been requested by Brawer to accompany Maucelli to Canada "just in case." In response to an inquiry from Maucelli, Brawer at this point vouched for the legitimacy of the securities and their absence from any list of stolen securities at that time; he enigmatically refused to certify that they would not be so listed in the future.

In Montreal, Maucelli and Ignomirello met with Riel. Ignomirello "went into the arrangements with J. R. [Riel] and said he was standing in for the owner who preferred to remain anonymous." (Exh. 3501–C). Riel, agreeing to accept a commission of between one and three percent of the face value of the Bills, took the travelers to the offices of North American Express Monorail Company, Ltd., where two officers thereof, Welsch and Bubic, indicated an interest in the securities. Negotiations ensued, during which the Canadians amply manifested an appreciation for the fact that the securities might be stolen.[2] Ar-

---

1. The unnamed principal, a local resident, had a federal criminal record for possession and sale of stolen property and for over a year Kreshik had acted as his probation supervisor. Disclosure of this background to Dembe might well have increased Dembe's instant wariness of the Bills.

1a. Maucelli refers to Brawer as his "cousin" in Jencks Act material furnished to defendants (Exh. 3501–C).

2. In point of fact, Government Trial Exhibit 3501(c), not previously before the Court of Appeals, reveals that at one point Maucelli told the government that Riel had stated

rangements were made for Maucelli and Ignomirello to return to New York and to reestablish contact with Welsch and Bubic at a later time to consummate the sale.

Thereafter, due to Brawer's displeasure at the slow pace of the proceedings, Maucelli traveled to Switzerland to attempt to effect a sale. However, this trip was unproductive.

Upon his return from Europe, Maucelli telephoned the Canadians from the airport in Brawer's presence to ascertain their continued interest in the transaction. Pursuant to this call, Bubic flew to New York and met with Maucelli. Together they proceeded to the Canadian Imperial Bank of Commerce branch in the Wall Street area, where the Bills were deposited. Maucelli and Bubic then flew to Montreal to consummate the deal the next day.

However, further problems developed. The Canadian bank demanded proof of ownership, and Maucelli telephoned to Brawer from Canada for instructions. Brawer directed Maucelli to represent himself as the owner, but this was unacceptable to the bank. Maucelli checked back with Brawer, and the latter authorized a sale of 65% of face value provided the deal could be consummated that very day. Upon the rejection of this offer, the deal fell through and Welsch and Maucelli journeyed to New York to retrieve the securities previously posted at the bank's branch here. Once in New York, Maucelli phoned Brawer from the airport; during this call, Maucelli put Welsch on the phone and Welsch spoke at length to Brawer whom Maucelli had introduced as "Hal." Upon arrival at the New York branch, Maucelli and Welsch were arrested by the FBI.

that if the items were stolen, he could still arrange for their sale, albeit at a greater discount—*viz.*, 50% of their face value. Whatever the probative force of this statement attributed by Maucelli to Riel, it certainly indicates that from the very outset Maucelli was telling a tale wherein the prospect of extraordinary discounts from the going market price of these securities was

II.

At the trial, the foregoing facts, among many others, were adduced through, *inter alia*, the testimony of Dembe, the banker; Maucelli, the co-conspirator; O'Brien, an officer of the New York branch of the Canadian bank; Murphy, an officer of duPont; and the grand jury testimony of the defendant Kreshik, which was read into the trial record. The defense consisted of character witnesses for the defendant Kreshik; the testimony of the defendant Brawer and his son, Idol; the testimony of one Sicherer, a friend of Brawer and former partner of Maucelli; and one Zalon, Maucelli's attorney. Kreshik and Ignomirello did not take the witness stand.

The testimony of Zalon was introduced to show the occurrence of a meeting between Brawer and Maucelli a few weeks prior to the trial. The attorney who represented both Brawer and Ignomirello at the trial, Mr. Horan, was also present at this meeting. Coincidentally, this same lawyer was also counsel to the widow of one Anthony Pirozzi, whose deceased husband had in fact been Kreshik's principal and the source of the Treasury Bills in question, and in whose house the meeting in question took place. In the trial context, the significance of the appearance and testimony of Zalon, who was called as a defense witness by Attorney Horan, was to negate an inference which Mr. Horan believed had been raised concerning certain possibly unprofessional conduct on his part. This dealt with the question of whether, and by whom, threats had been made at the pre-trial meeting between Brawer and Maucelli referred to above.

an essential element. This was readily apparent to anyone viewing Government Trial Exhibit 3501(c), as the prosecutor did on his receipt thereof and as defense counsel were free to do, and must have done, upon their receipt thereof before the close of Maucelli's direct testimony at trial. Record on Appeal 216.

The government elicited testimony that at this meeting Brawer attempted to persuade Maucelli to seek to withdraw his plea of guilty and stand trial with the other defendants, thus presenting "a united front at the trial." Further, that Brawer offered a monetary reward to Maucelli, the reimbursement of his attorney's fees, and the procurement of the testimony of a psychiatrist to the effect that Maucelli was incompetent at the time of his guilty plea.

Conflicting inferences arising from this meeting were propounded by the parties at the trial. However, a new and wholly different significance has been added thereto by the post-appeal hearings. To set the matter in proper focus requires a chronological account of the manner in which the material which defendants now seek to characterize as *Brady* matter came into the possession of the government as well as the manner in which the defendants purportedly came to be aware of its existence, and the manner in which they sought to inform the Court of Appeals of its nondisclosure and persuade that Court of its significance.

### III.

■ In April of 1969, following the arrest of Maucelli and Welsch in New York by the FBI, certain statements were taken by American and Canadian law enforcement officers. These were introduced into evidence at the post-appeal hearings before this Court and consist of the following: (1) A sworn statement given under the Canada Evidence Act on April 17, 1969 by Jacques Riel to Canadian law enforcement officials, and marked Exhibit 2 herein; (2) a signed statement given April 24, 1969 by Jacques Riel to agents of the FBI in New York, and marked Exhibit 3 herein; (3) a sworn statement under the Canada Evidence Act given by Ranko M. Bubic on April 17, 1969 to Canadian law enforcement officials, and marked Exhibit 4 herein; (4) a signed statement given on April 18, 1969 by Joseph Welsch to FBI agents in New York, and marked Exhibit 5A, 5B, 5C herein; and also (5) certain testimony given before the grand jury of this District by Joseph Welsch on April 22, 1973 in connection with the investigation of this matter, the minutes of which were marked as Exhibit 6 herein. Furthermore, handwritten notes were made by two Assistant United States Attorneys of their separate interviews with Jacques Riel; these were marked Exhibits 7 and 8. It is undisputed that all of the above items were in the files of the government and were never turned over to any defendant either prior to or during trial.

In the initial stages of the investigation, the government was only aware that some person or persons unknown had attempted to sell stolen Treasury Bills. An investigation was commencing, and any persons having possible exposure to the Bills were being interrogated. It is clear from the geometric progression of the inquiry and from the tenor of the statements obtained that the investigators were exploring and developing all leads as they emerged; furthermore, attention was focusing on the Canadians as possible targets of the inquiry. The statements referred to above were obtained in this context. None of the statements contained evidence of the guilt or innocence of any defendant; none was exculpatory of the defendants.

In contrast to this limited knowledge on the part of the government, both as to what had happened and who had been involved, the defendants Brawer, Ignomirello and Kreshik were in a position to have a clear view of both what had occurred and who had been involved. Ignomirello, of course, had first hand knowledge of both the identity and the whereabouts of Welsch, Bubic, and Riel, having himself been one of the conspirators who had traveled to Canada and dealt with these men there. Brawer admittedly possessed this same information through Ignomirello, whom he had brought into this matter and whom he characterized as a good and close friend, saying, "Ralph had the entire listings of everybody's address and phone numbers,

*which we still have."* This was clear to the Court of Appeals, which stated that "Brawer and Ignomirello [knew] of [the Canadians] existence" in that "the latter's identity and addresses were known to these two [defendants]." (482 F.2d at 135 & *id.* at n. 29). As to the knowledge of the defendant Kreshik, the Court of Appeals felt that the argument for a finding of a lack of such knowledge was "more compelling, since there was no evidence that Kreshik did in fact know anything about the Canadians." (*Id.* n. 29). However, on remand the defendant Kreshik has, by his own testimony, supplied this defect in the proof, if one in fact ever existed. It is now apparent that he too knew—back in April 1969—that one of the places which Brawer (and through him, Maucelli and Ignomirello) had either gone to or dealt with in his efforts to sell the securities was a "Canadian House." In fact, Kreshik was in contact with Brawer at about this time in respect to whom Brawer was meeting with and where Brawer was going.

Furthermore, if he did not previously know what Brawer was up to—a position impossible to maintain in the face of the record on this proceeding—Kreshik certainly had it spelled out for him at a meeting of Brawer and Pirozzi arranged and attended by Kreshik in late April or early May 1969. Kreshik had reported to Pirozzi that the man who was selling the Bills had been arrested because they were stolen securities. Pirozzi had denied that the Bills were stolen and had doubted the story of an arrest; he had countered by telling Kreshik that the man to whom Kreshik had given the Bills had taken off with them and had not been arrested and that Kreshik was to answer for them. Kreshik then drove Pirozzi to meet Brawer at a New Jersey diner where Brawer reported to Pirozzi on the dealings with the "house from Canada." Kreshik conveniently was in the men's room—he said—while the explanations were being made. Thereafter, Kreshik and Brawer met again, also at an eating place, to confer further.

Sometime after January 1972, having been indicted, Kreshik retained two local New Jersey attorneys to represent him. After speaking to him, and based on information received from him, they went to the New York branch of the Canadian bank which had been involved in the transactions set forth above. This was the same branch where Bubic and Maucelli had deposited the Bills; it was also the same branch where Maucelli and Welsch had been arrested by the FBI upon their return to recover the Bills. O'Brien, subsequently a trial witness for the government, was an officer of this branch. He had personal knowledge of Bubic's identity and participation herein, having dealt with the latter in person at New York on at least one occasion (April 16, 1969) prior to Welsch's arrest at O'Brien's bank. Each of these two Canadians, Welsch and Bubic, had given O'Brien their business cards, which identified them as being associated with the firm of North American Express Monorail Co. Thus, the identity and significance of both Welsch and Bubic who, as principals, were the only Canadians with any conceivable knowledge of the details of a discount offer—as opposed to Riel, who only acted as a finder—were readily ascertainable by Kreshik's counsel at the time of their visit to the Wall Street office of the bank. The pre-trial steps of the defense were taken against this background.

On March 1, 1972, Kreshik, through his counsel, demanded of the government, *inter alia*, the immediate disclosure of any *evidence* in its possession which might tend to exculpate him under the doctrine of Brady v. Maryland. The trial Assistant United States Attorney responded on March 10, 1972 by a letter to Kreshik's counsel, stating that "the Government, of course, consents to furnish you with any matter exculpatory of your client which might come into its possession during the pendency of this case. At the present time there is none."

After the government advised Kreshik's counsel that there was no material exculpatory of Kreshik in its possession at the time, the parties continued their preparations for trial. In late June 1972, a meeting took place at the home of Pirozzi's widow, Pirozzi having died in the interim. Present were Messrs. Maucelli and Brawer, the trial lawyer for Brawer and Ignomirello, Mr. Horan, and Maucelli's lawyer, Mr. Zalon. According to Brawer's trial testimony on direct examination, Maucelli advised the others that, despite his own belief in his own innocence, he was under great pressure from the Assistant United States Attorney to testify for the government at the trial. In this regard, he stated that, although he was not certain what the prosecutor wanted him to say, he had gotten the feeling that, if he would testify to having offered the Bills at a "cheaper price"—*i. e.*, a greater discount from face value—the government would be satisfied. Of course, counsel's reason for bringing this out at trial related to the defense theory, argued to the jury, that any such discount was a pure fabrication on Maucelli's part, probably concocted at the prosecutor's behest. However, Brawer's recital of what Maucelli said at this meeting illustrates the fact that, on the eve of trial, the persons at that meeting—Messrs. Brawer, Ignomirello, and Horan—had every reason to believe that at the trial Maucelli would testify regarding the discount, whether true or not. The meeting was tape-recorded by Brawer's representative; Kreshik learned this at the trial.

Shortly thereafter, Mr. Horan, in his capacity as attorney for the widow Pirozzi, spoke with the defendant Kreshik to report, according to the latter, that Mrs. Pirozzi would bring a replevin action, seeking possession of the Bills. Such an action would support a notion that Pirozzi was in fact the true owner of the Bills,—a peculiar contention made by Kreshik throughout, despite the evidence to the contrary. This also parallels what Maucelli was told at the meeting, just before the trial, with Brawer and Horan, where Maucelli was told that such an action would be commenced in conjunction with the suggested change of his plea of guilty to not guilty. In any event, whatever the true intent of Mrs. Pirozzi in this regard, it is not disputed that Mr. Horan, counsel for two of the three co-defendants about to go on trial, spoke with Kreshik, the only defendant not represented by him, shortly after having been informed by Maucelli that the latter would, in order to placate the prosecutor, testify to an offer of the Bills at a substantial discount from their market value. To believe, as Kreshik would have it, that no mention was made of Maucelli's forthcoming appearance and testimony as a government witness, taxes credulity too far. Under all the facts and circumstances, and on the basis of the demeanor of the witness and probabilities, all of Kreshik's testimony to that effect at the post-appeal hearing is hereby rejected in its entirety as unworthy of belief.

On July 5, 1972 the trial commenced. In his opening remarks to the jury, the prosecutor, in the presence of all defendants and their counsel, made explicitly clear the government's intention to prove that Brawer, acting on authority from Kreshik, had authorized Maucelli to offer the Bills at a substantial discount from their face value, and that Maucelli had done so. On the following day, Thursday, July 6, 1972, the witness Maucelli actually testified about his dealings with the Canadians wherein as a last ditch effort to negotiate a quick sale—pursuant to authority received from Brawer by phone—he offered to sell the Bills at 65% of face value, provided, as required by Brawer, the deal could be consummated the same day. Moreover, before the close of Maucelli's direct testimony, the government turned over the material required by 18 U.S.C. § 3500, the Jencks Act, which included a lengthy statement made by Maucelli wherein he stated that Riel had informed him that "if the items were stolen he could still arrange for the sale,

but at a greater discount—50% of value."

With this material added to what defendants already were informed of, it was crystal clear to all concerned—Brawer, Ignomirello, and Kreshik, and their respective counsel—that a proposal of a substantial discount by Maucelli to the Canadians would be a matter to be conjured with in the case. Yet, the authorization by Brawer to Maucelli of such a discount was not questioned by anyone when Brawer was on the witness stand; Brawer's attention was not directed to the claimed authorization from him although he admitted he may have participated in the phone call from Montreal in which it was expressed. After being fully apprised in the premises by the meeting before the trial and the prosecutor's opening statement and Maucelli's statements disclosed pursuant to the Jencks Act, none of the defendants could claim surprise by the damaging testimony of Brawer's authorization to offer the Bills at a deep discount for immediate cash and Maucelli's compliance therewith.

If anyone wanted to, or believed he could, contradict Maucelli on this point, the opportunity and the time to do so were at hand. Brawer, while on the stand, could have denied authorizing Maucelli to make such an offer. No such denial was forthcoming. Clearly all three defendants knew both the identity and whereabouts of the Canadians, particularly Welsch and Bubic, the only persons to whom Maucelli testified the 65% offer was made. Kreshik knew of the Canadians; he had talked with Brawer, and he had been given newspaper clippings on the arrest made at the New York branch of the Canadian bank. His information to his own lawyers sent them to that bank where Mr. O'Brien worked, and they made an investigation in Kreshik's interest.

A weekend followed shortly upon the heels of Maucelli's trial testimony on this point, and Montreal is readily accessible by phone and is but one hour away from New York by air, with flights regularly scheduled throughout the day. So far as disclosed by them, not one of the defendants or counsel saw fit to utilize the information then at hand to employ the weekend—a *de facto* continuance, as it were—for a quick call or trip to Montreal to develop whatever evidence might there be available from the sources known to them. The government cogently argues that this passivity was a calculated decision by the defense not to go into this area by way of testimony from the Canadians, who could not negate an authorization from Brawer to Maucelli and who well might come forth with something damaging. The defense chose rather to argue to the jury on summation that the government's failure to call the Canadians gave rise to an inference adverse to the government's contention. And that is the summation which the defense did make. It is clear that the defendants' present contention—that they did not seek out the Canadians because access to them was unknown—is a weak, baseless alibi and unsupportable under the facts and circumstances shown by the record herein.

## IV.

██ There was ample evidence on which to convict each defendant apart from and without need for Maucelli's testimony. This fact should moot discussion of the Canadians and what they might have said.

The defendants did not seriously contest the underlying transactional facts at trial. Rather, they resisted the government's attempt to charge them with knowledge of the stolen character of the Bills. Kreshik before the grand jury, and Brawer at trial, told essentially the same story as Maucelli, omitting only the oft repeated indicia of guilty knowledge, such as Brawer's displeasure at Maucelli's leaving the serial numbers of the Bills in places where he had been. Actually, Brawer even admitted making such remarks but stated—somewhat fantastically—that they were merely reflections of his concern that someone equipped with the serial numbers could,

without more, make a false affidavit of ownership and, claiming loss of the certificates, collect the face amount of the Bills from the Treasury at maturity.

On the question of guilty knowledge, the Court charged the jury that "an inference of the existence of knowledge may be drawn from evidence that the bills were stolen." Moreover on the issue of inferences of guilty knowledge to be drawn from the unexplained possession of recently stolen property, the Court charged the jury that it might properly infer from this fact alone that the defendants knew the securities were stolen. The Court of Appeals approved the Court's charge in all respects. 482 F.2d at 128–131.

In Barnes v. United States, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973), the Supreme Court affirmed a conviction for possession of stolen United States Treasury checks, knowing them to be stolen, holding that the following instruction comports with due process:

> possession of recently stolen property, if not satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw the inference and find, in the light of the surrounding circumstances shown by the evidence in the case, that the person in possession knew the property had been stolen.

This is in accord with a prior decision of this Circuit, United States v. Jacobs, 475 F.2d 270 (2d Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 131, 38 L.Ed.2d 53 (1973) wherein the Court of Appeals reiterated the long standing rule of Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 40 L.Ed. 1090 (1896), that

> Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence. 475 F.2d at 280.

The Court of Appeals noted that, as to one of the defendants in *Jacobs* (one Thaler), the record "fairly shrieked" of guilty knowledge, *id.*, based in large part on that defendant's asserted belief "that the lawful holder of treasury bills, matured or about to mature, would sell them at a discount, not of 10%, although even that would be hard to understand, but of 65%! His explanation that he believed this might be done for tax reasons increase[d] rather than remove[d] the inference of guilty knowledge." *Id.*

Kreshik stands in much the same position herein as did Thaler in *Jacobs*; he is convicted out of his own mouth, not on the basis of Maucelli's testimony, but on the basis of his incredible attempts to explain away the possession of the recently stolen property. The *Brady* issue does not bear on Kreshik's guilt of the substantive offense. He was convicted fundamentally on his own participation and mysterious and unexplained possession of the recently stolen property (supported by the testimony of Dembe) and on his secrecy and furtiveness coupled with his request for a foreign transaction, and not on his participation in or connection with Maucelli's activities. The Canadians would not have aided Kreshik because, as everyone agrees, Kreshik did not deal directly with them. There was ample independent evidence that the Bills were stolen, and this could not be contradicted by the Canadians, no matter who called them. *See* United States v. Fried, 486 F.2d 201, 203 (2d Cir. 1973) (combination of bizzare circumstances and outright lies by defendant); United States v. Mayersohn, 452 F.2d 521, 527 (2d Cir. 1971). There was an adequate basis in the false and inherently incredible grand jury testimony of Kreshik, as well as the contrary Dembe trial testimony, standing alone, to sustain Kreshik's conviction herein. A *fortiori*, when the evidence is considered in its entirety. *See* United States v. La-Froscia, 485 F.2d 457, 458 (2d Cir. 1973). Accordingly, evidence from the Canadians as to the terms discussed

with Maucelli would not have affected the jury's verdict as to Kreshik.

Totally apart from the fact of Maucelli's ultimate offer, authorized by Brawer, to sell the Treasury Bills to the Canadians at 65% of face value, there was powerful evidence of the guilt of all of the defendants, including *inter alia,* the following: the fact that the *original* price at which they were being offered was 85% or 90% of face value, to be further reduced by an additional 10% to represent the commission to be shared between Brawer and Maucelli—itself an extraordinary discount, *see* United States v. Jacobs, *supra*; the fact that the Bills were to be sold only for cash; the fact that the sale had to be consummated in a hurry—offshore, out of the country, through irregular means rather than local banks or brokerage houses or, for that matter, Dembe himself; the fact that the identities of Brawer and Kreshik were not to be disclosed to prospective purchasers, by express direction to Maucelli; the fact that all three defendants were in possession of $262,000 of securities not commonly traded by individuals not only very shortly after the theft of those securities but, indeed, within a few weeks of the issuance thereof; the fact that none of the defendants possessed any documents evidencing ownership of the Bills; and, as to the defendant Kreshik, the fact that his testimony before the grand jury concerning numerous material facts was proven false by the trial testimony of Dembe.

In sum, it is apparent that the impact of all the testimony, documentation and circumstances, taken together with the inferences necessarily and properly arising therefrom, is that the defendants attempted to sell stolen Treasury Bills with the guilty knowledge that they were stolen.

## V.

■ There remains one further matter requiring discussion herein. Much has been made of what have been char-acterized as the post-trial "affidavits" of Messrs. Welsch and Bubic, submitted to the Court of Appeals as appendices to the reply briefs of Brawer and Ignomirello in artfully redacted form. Whatever the intrinsic validity, if any, thereof, these "affidavits" are wholly irrelevant to the question of the exculpatory nature *vel non* of the 1969 statements. Assuming for the moment their truth, they are nevertheless relevant only to a hindsight analysis of what might have been developed by skilled counsel had they seen fit to produce and interrogate the Canadians at an earlier date. While this may be an interesting intellectual exercise, it is a fruitless one on the present record.

In their original briefs on appeal, Brawer and Ignomirello proceeded by disingenuous assertions of speculation and conjecture as to what "might" be in the government files. *See* United States v. Ruggiero, 472 F.2d 599 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973). After the government confirmed the existence of the 1969 statements, Brawer and Ignomirello responded in their reply briefs with the "affidavits" of Welsch and Bubic which they annexed in what seemed to be the form in which they had been executed. In the form furnished to the Court of Appeals, they appeared to be two affidavits, regular on their face, executed in Quebec, Canada *on January 16, 1973*. These documents, if read for their maximum possible implicit impact, would appear to indicate that, if called as witnesses, Welsch and Bubic would contradict Maucelli's trial testimony head on in respect to his dealings in Canada.

At the post-appeal hearing held herein, counsel for defendant Kreshik sought to mark for identification alleged xerox copies of these "affidavits," carefully not vouching for them and noting that they were being "offered *not for the truth* of the statements made therein." Upon seeing the documents thus proffered, containing internal evidence that the pages copied must have been on dif-

ferently lined papers, and of other irregularities in what was offered, the Court inquired where the originals were and was ultimately told by counsel for defendants Brawer and Ignomirello that they were in his custody. However, he declined to offer the originals into evidence, offering copies "for [the Court's] guidance to make whatever use" thereof it saw fit. Its curiosity aroused, the Court demanded production and took possession of what counsel described as the originals from which xeroxes had been made by him. These documents were marked as Court's Exhibits 1 and 2 for identification herein.[3]

Each document contains several pages. Some are xerox copies; others are typed originals. Some are full sheets; others are cut down in size in an irregular and jagged manner. Some are on paper having margin lines printed thereon; others are on blank sheets. The longest one is a full thirteen inches; the shortest, a mere two inches. Textual matter has been cut in mid paragraph. Page numbers have been altered; typescript overwritten by ink. Some are typed in the English fashion; others follow the American form. This Court is not expert in such matters, but it appears that different typewriters have been employed in the preparation of different, noncontiguous, pages within the same document. Each document bears a jurat wherein the typed month has been superseded by an inked-in later month. They were clearly typed for signature some time in December 1972; both typescripts bear the following jurat: "Sworn to before me this [——] day of December, 1972." Moreover, above each jurat, the statement reciting the number of pages read and initialed by the "affiant" has been visibly altered; ink has been superimposed over typescript. Each is sworn to, allegedly, before a "practising attorney for the province of Quebec authorized to administer oaths" whose signature is undecipherable; however, each attestation is in the same color ink as the primary signature to which it purports to attest.

In the Brawer—Ignomirello reply briefs, the Court of Appeals was given purported copies of these documents that did not correspond to the form of the originals. The originals give internal evidence that their contents were recast [doctored] after the original typing thereof. No satisfactory or other explanation from the purported affiants has been presented to this Court. The xeroxes offered by the defense were marked for identification at the hearings and were not received in evidence for lack of authentication.[4] The Court notes that the proposed findings of the defendant Kreshik place no reliance on these alleged affidavits, and do not even mention them.

The only issues at this time concern the allegedly suppressed 1969 statements. But, for purposes of comprehension, and to avoid circuity, treating the 1973 "affidavits" as newly discovered evidence, the facts conclusively establish that defendants have failed to show, as they must, that such purported evidence could not have been discovered before or during trial by the exercise of due diligence. The rule thereon in this Circuit is clear.

3. Copies of these exhibits have been prepared by the Court to accurately reflect the state in which it received the originals; such copies are filed herewith. The exhibits themselves will be lodged with the United States Attorney for the Southern District of New York.

4. One tell-tale point, worthy of note at this juncture, appears in the redacted Welsch affidavit. It recites the circumstances of his questioning by Assistant United States Attorney Wing on April 18, 1969 in the offices of the United States Attorney in New York. Also present, according to Welsch, was Assistant United States Attorney Horowitz, the eventual trial assistant, "although at this time I am not sure he questioned me." The fact is that Mr. Horowitz joined the staff of the United States Attorney for the Southern District of New York in October 1969—or six months after Welsch allegedly swears he was interrogated by Assistant United States Attorney Wing in the presence of Assistant United States Attorney Horowitz.

## VI.

█ The case law in this area dates from May 13, 1963, the date on which the Supreme Court decided Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but that case itself merely serves as a convenient embodiment of a fundamental precept of justice, probably as old as our legal system itself. It is fundamentally unfair for a man to be convicted of a crime when the prosecutor has knowledge of facts which indicate to him that the defendant did not in fact commit that crime. If he knows this conclusively, justice requires that he not go forward with the prosecution. If the degree of his knowledge is less, but the possibility is still present, *Brady* requires him, upon demand, to disclose to the defense the facts peculiarly and exclusively within the prosecutor's knowledge, and unavailable to the accused.

In Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), the Court condemned "a deliberate deception of the court and jury by the presentation of testimony known to be perjured." Pyle v. Kansas, 317 U.S. 213, 215–216, 63 S.Ct. 177, 87 L.Ed. 214 (1942), expressed the Court's disapproval of the knowing use of perjured testimony, coupled with a deliberate suppression by state authorities of evidence favorable to the defendant. In Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), the Court said: "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." This is so even where the false testimony goes only to the credibility of a witness.

█ In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197 (1963), the Court formulated this rule:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

According to the language of *Brady*, in order to come within its ambit, the subject matter of the defendant's complaint of suppression must be *evidence* (United States v. Ruggiero, 472 F.2d 599, 604 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973)) *favorable* to defendant for which he made a *timely demand*; (United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968)); moreover, such evidence must be *material*, either to guilt (Moore v. Illinois, 408 U.S. 786, 794–795, 92 S.Ct. 2562, 33 L.Ed. 2d 706 (1972); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968)), or punishment. The absence of any of these factors, unless supplied by implication, *see* United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964), seemingly precludes a claim of deprivation of due process under *Brady*.

In *Wilkins, supra,* Judge (later Mr. Justice) Marshall, with the concurrence of Judges Waterman and Hays, ruled that a request by the defense is not the *sine qua non* of the prosecutor's duty. *Id.* at 137. *Wilkins* adopted the view of Judge Hastie, concurring in United States ex rel. Thompson v. Dye, 221 F. 2d 763 (3d Cir.), cert. denied, 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 773 (1955), that

> whether or not the prosecutor in a criminal case must disclose evidence in his possession favorable to the accused depends on many factors, and a case-by-case judgment must be made. "It seems likely that many situations will arise in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false." 326 F.2d at 138.

Bearing in mind that the testimony allegedly suppressed in *Wilkins* was unquestionably material, 326 F.2d at 140, the Court of Appeals refused to "[formulate] the duty in terms of wilful or wrongful conduct [by the prosecutor, a standard which] would seem only to confuse here, and is not necessary under the governing law as we understand it."

*Id.* at 139. However, the Court of Appeals did "agree that the availability of witnesses to the defense through its own investigations is a relevant consideration, but we do not think it is ordinarily determinative." *Id.* at 140. The context of this thought was the argument that a defendant who located witnesses post-trial could, through the exercise of due diligence, have located them pretrial as well. There was no showing in *Wilkins*, in contrast to the facts at bar, that the defense *in fact* knew of the identity and whereabouts of the witnesses in question prior to the trial. *Compare* United States v. Purin, 486 F.2d 1363 (2d Cir. 1973); United States v. Pollak, 474 F.2d 828 (2d Cir. 1973); United States v. Ruggiero, 472 F.2d 599 (2d Cir. 1973), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973); *cf.* United States v. Soblen, 301 F.2d 236 (2d Cir.), cert. denied, 370 U. S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962).

In Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), a decision by a plurality of the Court, Mr. Justice White, concurring in the judgment, cautioned that any claimed violation of the rule of Napue v. Illinois, *supra*, must be viewed in the context of the entire trial. Thus, where the credibility of the complainant in the *Giles* case was a central issue, even though statements allegedly suppressed might have introduced inconsistencies in the witness' evidence, no prejudice ensued from non-disclosure, since, as Justice White observed "these issues were not overlooked by petitioner's counsel at trial, who then confronted the complaining witness with the inconsistency in her allegations [manifest on their face, even absent the material not disclosed]. Had petitioner's counsel been less diligent, the false testimony might rise to the level of a *Napue* violation." *Id.* at 82, 87 S.Ct. at 801. Mr. Justice White further stated:

In the end, any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense. *Id.* at 96, 87 S.Ct. at 808.

Also concurring in the judgment of the Court in *Giles*, Mr. Justice Fortas observed:

This is not to say that convictions ought to be reversed on the ground that information merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court, or without importance to the defense for purposes of the preparation of the case or for trial was not disclosed to defense counsel. It is not to say that the State has an obligation to communicate preliminary, challenged, or speculative information. *Id.* at 98, 87 S.Ct. at 809.

*Accord,* Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

In United States v. Tomaiolo, 378 F. 2d 26 (2d Cir.), cert. denied, 389 U.S. 886, 88 S.Ct. 159, 19 L.Ed.2d 184 (1967), Judges Medina, Feinberg and Anderson were confronted with the appellant's argument that, since certain grand jury testimony would have aided his defense, the government's failure to disclose the same to him constituted unlawful suppression. Disposing of this contention, the Court of Appeals said:

we discern no reason to suppose an extension of the present rule [*Mooney*; *Napue*; *Brady*; *Giles*] to include the failure of a prosecutor to call to the attention of the defense evidence that is wholly lacking in probative force because of its speculative quality . . . .

To obtain a new trial a convicted defendant must, moreover, show more than the suppression of evidence. The evidence must also be shown to be material and of some substantial use to the defendant. *Id.* at 28.

In any event, the Court observed, the appellant had obtained the full benefit which he might have expected to obtain from the undisclosed matter from other sources available to him at the trial.

In the seminal decision of United States v. Keogh, 391 F.2d 138 (2d Cir. 1968), Judge Friendly, writing for himself and Judges Waterman and Hays, recognized that:

In seeking a workable solution courts must consider not only the maximizing of protection to convicted defendants but the avoidance of impossible burdens on prosecutors and the need to preserve the finality of convictions rendered after trials as nearly faultless as human frailties will permit. *Id.* at 146.

█ Speaking of the office of a request for *Brady* material, the Court of Appeals in *Keogh* said that such a request "serves the valuable office of flagging the importance of the evidence for the defense and thus imposes on the prosecutor a duty to make a careful check of his files." *Id.* Obviously, this contemplates a fairly specific request; a blunderbuss demand for any material in his files, possibly exculpatory, serves to flag nothing to the prosecutor's attention.

Absent a narrowing of the field by an appropriately drawn request, the defense bears the possible risk of the prosecutor's good faith failure to realize the potential significance of an item in his voluminous files, or even his complete failure to recollect its very existence. In such instances, "the assurance by the government that it has in its possession no undisclosed evidence that would tend to exculpate defendant justifies the denial of a motion for inspection *that does not make some particularized showing of materiality and usefulness.* Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), does not suggest a contrary result." United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969) (Hays, Lumbard & Feinberg, C. JJ.) (emphasis supplied); *accord*, United States v. Crisona, 416 F.2d 107, 116 (2d Cir. 1969) (Lumbard & Feinberg, C. JJ., Timbers, D. J.), cert.

denied, 397 U.S. 961, 90 S.Ct. 991, 25 L. Ed.2d 253 (1970).

█ In addition to a reasonably particularized demand, *Keogh* teaches that to be cognizable, the non-disclosure must, by a substantial probability, be one which would have altered the result:

The request cases also stand on a special footing; the prosecution knows of the defense's interest and, if it has failed to honor this even in good faith, it has only itself to blame. *Failure to appreciate the use to which the defense could place evidence in the prosecution's hands, or forgetfulness that it exists when a development in the trial has given it a new importance, are quite different.* Since this must happen to the most scrupulous prosecutors and the issue of deterrence scarcely arises, the problems of the courts and the wider interests of society unite to *require a substantially higher probability that disclosure of the evidence to the defense would have altered the result.* To invalidate convictions in such cases because a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties. *Id.* 391 F.2d at 147–148. (emphasis supplied) [5]

Applying this standard of relative materiality to the *Keogh* case, the Court of Appeals pointed out that the grand jury testimony of a person not a witness *"would have added nothing,"* id. at 141 (emphasis supplied), to the record which already contained extensive cross-examination of the trial witnesses on the point in question.

In United States v. Jordan, 399 F.2d 610 (2d Cir.), cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968), Judge Hays, speaking for himself and Judges Moore and Timbers, made clear, if any clarification was required, that, "[*Brady*] does not require the gov-

---

5. Quoted in part with approval in Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

ernment to disclose the myriad immaterial statements and names and addresses which any extended investigation is bound to produce." *Id.* at 615; *accord*, Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Giles v. Maryland, 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring).

United States ex rel. Fein v. Deegan, 410 F.2d 13 (2d Cir.) (Waterman & Feinberg, C. JJ.; Bartels, D. J.), cert. denied, 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450 (1969), dealt with the claimed suppression of the testimony of Dagmar, an uncalled associate of Gloria, a prosecution witness. The Court of Appeals said in that case:

> Dagmar's testimony did not bear directly upon the guilt of punishment of Fein. At most, it pertained to Gloria's credibility, provided one could bridge the gap of Dagmar's incredibility. Gloria's credibility, however, had been relentlessly attacked by an exhausting and punishing cross-examination in which her recantations and background were thoroughly explored. Even the prosecutor in his summation described her, among other things, as "notorious," "a moral leper," and "an old whore." Nevertheless, the jury believed enough of Gloria's testimony, as corroborated by Broudy and Geri, to convict Fein. *Id.* at 18–19.

In denying the relief sought, the Court of Appeals noted the failure of the defense to either request Dagmar's full name, or indicate that the defense could not locate her. In fact, defense counsel knew about her, and cross-examined a witness concerning her. Moreover, the Court of Appeals found it difficult to evaluate Dagmar's testimony as material.

Addressing itself to the appropriateness of the remedy of a new trial sought by Fein, the Court of Appeals said:

> It is appropriate to note that upon an application for a new trial based upon newly discovered evidence, due diligence is an essential factor . . . And such application will not be granted if the evidence is merely impeaching. . . . To relieve the defendant of his duty of due diligence, the evidence of prosecutorial suppression should be clear and unequivocal . . . *Id.* at 20. (citations omitted).

*See also* United States v. Fried, 486 F.2d 201 (2d Cir. 1973) (Kaufman, Ch. J., Moore & Mansfield, C. JJ.) ("[A]" new trial may be ordered [in a case of negligent nondisclosure] only upon a showing that there is a significant chance that the non-disclosed item, developed by skilful counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.");[6] United States v. Kahn, 472 F.2d 272, 287 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); United States v. Mayersohn, 452 F.2d 521, 525–526 (2d Cir. 1971) (Moore, Hays & Feinberg, C. JJ.); United States v. Bonanno, 430 F.2d 1060, 1063 (2d Cir.) (Friendly, Smith & Hays, C. JJ.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969) (Moore, Friendly & Feinberg, C. JJ.). *Compare* United States v. Mele, 462 F.2d 918, 924 (2d Cir. 1972) (per Mr. Justice Clark) ("[E]ven in cases of extreme prosecutorial misconduct, a new trial is not granted if the suppressed evidence or the misleading portions of the Government's case could not possibly have had an effect on the jury's verdict.").

More recently, the Supreme Court has returned to this area in Moore v. Illi-

---

6. This standard derives from Napue v. Illinois, *supra*, wherein the Supreme Court stated that a new trial was required only if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." 360 U.S. at 271, 79 S.Ct. at 1178, *quoted in* United States v. Brawer, 482 F.2d 117, 136 (2d Cir. 1973).

nois, 408 U.S. 786, 92 S.Ct. 2562, 33 L. Ed.2d 706 (1972), making its position quite clear:

> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. *Id.* at 795, 92 S.Ct. at 2568.

The Court also made clear that a determination of materiality, required by *Brady*, must be made "in the light of all the evidence" in the case. *Id.* at 797, 92 S.Ct. at 2569.

In United States v. Ruggiero, 472 F. 2d 599 (2d Cir.) (Lumbard, Feinberg & Mansfield, C. JJ.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973), the defendant, based on what he "presumed" certain witnesses must have testified to before the grand jury, argued that denial of access to the transcripts of such testimony of these persons, none of whom was called by either side or testified at trial, infringed his right to due process under Brady v. Maryland. The Court of Appeals reiterated the Supreme Court's statement in Moore v. Illinois, *supra*, that "[t]he heart of the holding in *Brady* is the prosecution's *suppression of evidence* . . . ." (emphasis by the Court of Appeals). Recalling Justice White's statement in *Giles*, *supra*, that "any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense," the Court held that an essential element of the *Brady* rationale was, in *Ruggiero*, missing.

> Appellant knew the identity and location of Lundy and Sheridan and the likelihood that they might give testimony helpful to his defense. Indeed, according to his own testimony Ruggiero had originally participated in conversations with each of them relating to the matters that were later the subject of his grand jury testimony and had every reason to believe, if his own denial of his or their involvement in any attempted bribery is accepted, that they would in all likelihood corroborate his testimony rather than fabricate a bribery scheme that would only serve to incriminate themselves. The likelihood that Lundy would have given such corroboratory proof was apparent from all the surrounding circumstances, including the government's failure to call him as a witness at trial [A point which defense counsel accentuated in his summation]. *Id.* at 604.[7]

The Court of Appeals in *Ruggiero* demonstrated the inapplicability of *Brady* to a case where the evidence allegedly not disclosed was equally, if not more so, available to the defense as to the prosecution.

> The purpose of the *Brady* rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him. Here the appellant was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as Lundy and Sheridan might furnish. He was also well aware of the process by which they might be compelled to testify at trial. As long as they could be subpoenaed to testify, their grand jury testimony, if offered in their absence, would have been excluded as hearsay. If appellant wanted their testimony, the obvious and logical course was to subpoena them and put them on the witness stand.

---

7. Ruggiero's counsel summed up in part as follows: "[T]hey had Mr. Lundy before the grand jury. They heard his testimony. . . . Don't you think for one second that if Mr. Lundy had testified before the grand jury, that if this man said anything improper to him, had offered him any money, had told him to fix this deal, they would have had him in here on this witness stand so fast it would have made their eyes pop?" 472 F.2d at 604.

Before calling Lundy and Sheridan as trial witnesses, defense counsel was not legally barred from interviewing them to ascertain the substance of their prospective testimony. Indeed if he had not attempted to do so he would have been remiss in the performance of his pretrial duties as trial counsel. . . . *Id.* at 605. (citations omitted).

*Accord*, Moynahan v. McDonald, 471 F. 2d 700, 702 (2d Cir. 1973) (per curiam).

It is clear that Ruggiero's counsel sought to have it both ways:

[D]efense counsel had strong reason to believe that Lundy's testimony would be helpful to the defense *and he so argued to the jury.* Yet he did not subpoena Lundy to testify, as he had a right to do, and he did not advise the court of any inability to elicit Lundy's testimony. *Id.* (emphasis supplied).

Having failed to persuade the jury to draw inferences favorable to his client from the government's failure to produce Lundy as a prosecution witness—his preferred tactic—counsel then reverted to his fallback position, seeking on appeal to overturn the conviction on the grounds that Lundy's identity and testimony should have been made available to him under *Brady* and that the failure to do so violated due process. It was not a novel strategic ploy of defense counsel then; it has gained no stature since. *Cf.* United States ex rel. Romeo v. McMann, 418 F.2d 860, 865 (2d Cir. 1969) (Friendly, Hays & Anderson, C. JJ.), cert. denied, 398 U.S. 913, 90 S.Ct. 1715, 26 L.Ed.2d 77 (1970).

Following *Ruggiero*, in United States v. Pollak, 474 F.2d 828, 832 (2d Cir. 1973), the Court summarily dismissed appellant's *Brady* point with the brief statement that it was doing so "because the two witnesses . . . were known, friendly and available to [the defendant] . . ." *Cf.* United States v. Eustace, 423 F.2d 569, 573 (2d Cir. 1970).

More recently, the Court of Appeals has said that "[e]ven where evidence falls within the rule of *Brady* . . . the Government need not *sua sponte* give notice to the defense where the accused has knowledge of the evidence . . . . In any event, the Government's aborted attempt to introduce the evidence on its direct case did give the defense a full day's time to prepare." United States v. Purin, 486 F.2d 1363, 1368 n. 2 (2d Cir. 1973) (citations omitted). *See* United States v. Roberts, 388 F.2d 646, 648 (2d Cir. 1968) (Kaufman, Anderson & Feinberg, C. JJ.)

This concept is neither new nor unique to *Brady* or its progeny. In United States v. Soblen, 301 F.2d 236, 242 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962), a case which preceded *Brady*, the Court said:

[W]hile the prosecution has a duty to disclose, on its own initiative, exculpatory facts within its exclusive control, . . . it has no such burden when the facts are readily available to a diligent defender.

## VII.

Based on the foregoing analysis of the prevailing relevant law, and for the reasons hereinafter stated, the following are the ultimate facts and conclusions of law applicable here:

■ The 1969 statements of the Canadians were not in fact exculpatory.

These statements are not in any sense material to the question of guilt, *vel non;* neither do they bear directly upon the credibility of the witness Maucelli.

■ Kreshik's demand for "any information which tends to exculpate the defendant Wassil Kreshik" did not serve to put the prosecutor on notice of the defendant's interest—whatever that may have been—as it was overbroadly drawn.

■ In any event, the identity of the Canadians, their location, and the potential value of their testimony, if any, were not facts of a kind known to

the government and unknown to the defense; indeed, they were facts far better known to and appreciated by the defense than the government.

The 1969 statements here involved are self-serving extrajudicial declarations which do not admit any criminal knowledge or participation by persons who, at the times the statements were made, had recently been involved in transactions concerning the Bills here at issue which were questionable at best; the declarants were themselves subject to possible criminal charges and thus had strong motive to fabricate. Accordingly, such statements themselves could not have been admitted into evidence on the defendants' case, and thus do not satisfy the primary requisite of *Brady* material —that it be evidence. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Ruggiero, 472 F.2d 599, 604 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973). Moreover, the statements on their face do not impugn the credibility of Maucelli's testimony; they may possibly [but not relevantly] add other dimensions, but they do not detract from the evidence given by him. *Compare* United States v. Keogh, 391 F. 2d 138, 141 (2d Cir. 1968).

The defendants' basic contention in respect of the 1969 statements is that they "contradict" Maucelli's trial testimony *by silence.* That is to say, the statements themselves say nothing one way or the other of a discount offer— they neither confirm nor deny its existence. Apparently the defendants, if they had been taking these statements, suggest they would have included inquiries to elicit whether such an offer had in fact been made. Defendants, without basis therefor, attribute the absence of any information thereon to a contrary view of the facts which they hypothesize on the part of the Canadians. A more compelling explanation, apparent from the face of the statements, is that the Canadians, as likely targets of the investigation, were never specifically asked about such a discount, and were prescient enough not to volunteer any information thereon. To the extent—albeit a very limited one—that the statements cover the same ground covered by Maucelli in his trial testimony, they are largely consistent therewith, particularly with regard to material transactional facts. The chief difficulty with the statements · is that, to a large extent, they cover neutral areas in respect of which Maucelli did not testify at trial. Reading them against Maucelli's trial testimony is akin to watching two trains pass in the night on opposite tracks in opposite directions.

Taken as a whole, Riel's various statements (exhibits 2, 3, 7 & 8 herein) are consistent with Maucelli's trial testimony in so far as most of the transactional facts are concerned. For example, in exhibit 8, Riel avers that Maucelli stated that the deal had to be in cash, and acknowledges that Ignomirello was upset that the deal had not been consummated on April 11, 1969. Further, in exhibit 3, Riel states that on April 10, 1969, Maucelli mentioned that the Bills came from a priest. He also states that on April 11, 1969, both Maucelli and Ignomirello mentioned that there was an additional $500,000 of Treasury Bills available. Exhibit 2 is to similar effect.

In none of Riel's four "statements" does he specifically state the price which Maucelli asked for the Bills nor does he contradict Maucelli's trial testimony that the original price asked was 85% or 90% of face value, less Riel's own commission, and that the final price was 65% of face value. This is entirely consistent with Maucelli's portrayal of Riel as a "finder." The offer was made to Welsch and Bubic as principals; the final terms were the product of negotiations between the parties (not including "finder" Riel) and were not arrived at until some time later.

Bubic's one "statement," exhibit 4 herein, is the only one of the statements in question which addresses itself to the question of what discount the Bills were offered at. His statement thereon is that the price of the sale (and not the

"investment" portrayed by Welsch) was to be 90% of the face value of the Bills. But Bubic further asserts, in the same "statement," that the "final price was to be negotiated and it would depend on . . . what terms and conditions they would have to be sold to us." (sic). This recitation of an opening gambit of 90%, with further negotiations to follow, is consistent with Maucelli's trial testimony. Bubic's statement does not advert to and consequently does not specifically deny the 65% figure authorized by Brawer. Furthermore, insofar as the nonincriminatory facts of his dealings with Maucelli are concerned, e. g., the dates of Maucelli's travel, Bubic's statement is consistent with Maucelli's trial testimony. Bubic's statement is silent, however, in respect of the possibly incriminating facts of Bubic's involvement herein, e. g., the fraudulent story which Bubic told O'Brien at the New York bank as to the purposes of the transaction and the origin of the Bills.

In neither of the two "statements" of Joseph Welsch, exhibits 5A, 5B, 5C, and 6 herein, does he refer to the price which Maucelli asked for the Bills. Furthermore, the transactional facts which Welsch does recount are consistent with Maucelli's trial testimony with only one insignificant exception, viz., Welsch's claim that Maucelli was interested in investing in the Canadian firm, and was not interested in selling the Bills. What Maucelli was supposed to use as capital for investment is not stated. Not only does Welsch contradict Maucelli in respect to a purpose to sell the Bills, but he also contradicts his partner Bubic as well. See exhibit 2 herein. Finder Riel agrees with Bubic on this point, for whatever that is worth.

More importantly, Welsch's statement is cast in the alternative, and the second prong thereof is entirely consistent with Maucelli's trial testimony.

Needless to say, none of the 1969 statements deals at all with Brawer's authorization to Maucelli to make an offer of the Bills at 65% as a last ditch effort to effect a sale.

Placed in perspective, the brouhaha created over the non-disclosure of the 1969 statements appears to be a contrived issue wholly lacking in merit. It was created on appeal out of a tissue of confusion and legerdemain on someone's part.

Counsel for defendant Kreshik as much as admitted at the post-appeal hearing that the statements do not bear on the discount authorized by Brawer as related by Maucelli, when he said

we know of nothing to indicate that he [Riel] was [specifically questioned on the point]

Counsel agreed that all we have is an absence of information on that point in each of the statements and before the grand jury. The 1969 statements are silent on "the only point that would have been useful to defense counsel." United States v. Keogh, supra, at 141. Their lack of informational content on this issue could not have been developed by counsel to the point that an acquittal would reasonably follow from their use at trial.

In any event, Maucelli was thoroughly cross-examined, frontally and forcefully on the inconsistency which a denial of a deep discount offer would produce. See United States ex rel. Fein v. Deegan, 410 F.2d 13 (2d Cir.), cert. denied, 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450 (1969). His prior inconsistent statements on this very point before the grand jury were examined into, cf. Giles v. Maryland, supra, at 82, and defendants obtained the full benefit available from this line of inquiry. See United States v. Tomaiolo, 378 F.2d 26 (2d Cir.), cert. denied, 389 U.S. 886, 88 S.Ct. 159, 19 L.Ed.2d 184 (1967). The addition of the 1969 statements to the cross-examiner's arsenal could in no way have added to the barrage fired at Maucelli, in large part predicated upon ammunition fashioned out of his own prior testimony, turned over to the defense under the

Jencks Act, 18 U.S.C. § 3500.[8] In no event would the outcome have differed; if the jury believed Maucelli in the face of the withering cross-examination to which defendants subjected him—as they properly might have, and apparently did—they would not likely have been dissuaded by learning that persons characterized by the prosecutor on summation as "crooks" might hold slightly different views on how the Canadian transactions should be characterized. *See generally* United States ex rel. Fein v. Deegan, 410 F.2d 13, 18–19 (2d Cir.), cert. denied, 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450 (1969).

The jury had all the facts essential for a fair appraisal of Maucelli's testimony before them. The Court is satisfied that, in light of all the evidence, Moore v. Illinois, 404 U.S. 786, 797, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *see* United States ex rel. Meers v. Wilkins, 326 F.2d 135, 138 (2d Cir. 1964), and in the context of the entire trial, Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), the undisclosed statements would not have permitted or enabled the defendants to so present their case that they would probably have raised a reasonable doubt as to their guilt in the mind of a conscientious juror. The probability that disclosure of the statements to the defense pre-trial would have altered the result is zero. Defendants received a fundamentally fair trial. "The pans contain weights and counterweights other than the interest in a perfect trial." United States v. Keogh, *supra*, 391 F.2d at 147, quoting Kyle v. United States, 297 F.2d 507 (2d Cir. 1961).

Defendants maintain that the 1969 statements fall within the ambit of *Brady* by virtue of the leads—*otherwise*

*unavailable*—they would have provided to defense counsel prior to trial. Assuming, without deciding, that this is a proper construction of *Brady*, defendants do not even come within such a rule.

It is clear beyond peradventure of doubt that "the availability of witness to the defense through its own investigations is a relevant consideration." United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964). *A fortiori*, where the defense has actual knowledge of the existence, significance, and location of witness or other evidence which may prove useful to it. United States v. Purin, 486 F.2d 1363, 1368 n. 2 (2d Cir. 1973); United States v. Pollak, 474 F.2d 828 (2d Cir. 1973); United States v. Ruggiero, 472 F.2d 599 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973); *cf*. United States v. Soblen, 301 F.2d 236 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962). *Compare* United States ex rel. Meers v. Wilkins, *supra*. This is so because "[i]n the end, any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." Giles v. Maryland, 386 U.S. 66, 96, 87 S.Ct. 793, 808, 17 L.Ed.2d 737 (1967).

It is abundantly clear on this record that all three defendants and their counsel were "on notice of the essential facts required to enable [them] to take advantage of such exculpatory testimony as [the Canadians] might furnish." United States v. Ruggiero, *supra*, 472 F.2d at 604. Under the charitable, if unwarranted, assumption that they actually failed to realize this turn of events until after Maucelli actually testified to the authorization and mak-

---

8. In an overabundance of caution, this Court at the close of the hearing ordered the prosecutor to turn over certain other materials contained in his files—including Government Trial Exhibit 3501(c)—pursuant to a generalized demand by counsel for Brawer and Ignomirello. The Court has conducted an *in camera* inspection of this material and, upon consent of the government, allowed the same to be furnished to the defendants. The materials so disclosed have been marked Court's exhibit 3 herein, and are filed with the Clerk of the Court. It suffices to note that nothing contained therein in any way alters the result reached herein.

ing of the 65% offer, it is still unexplained why no one asked for a continuance during which to undertake a phone call or the brief flight to Montreal. No counsel ever apprised the Court of any difficulty, anticipated or encountered, in obtaining these witnesses. *See* United States v. Ruggiero, *supra*, at 605; United States ex rel. Fein v. Deegan, *supra*. With the intervening weekend following directly upon the heels of this testimony, the defense had ample time to prepare, even absent a formal continuance. *See* United States v. Purin, *supra*, 486 F.2d at 1368 n. 2. The fact that this time was not utilized to secure the desired testimonial proof, if any there was to be had, gives credence to the view that the defense team made an affirmative strategic decision to forego this in favor of a summation [9] asking the jury to draw inferences adverse to the government from its failure to produce the Canadians on its direct case.

Nowhere have the defendants alleged or proved—by even a fair preponderance of the credible evidence—that the Assistant United States Attorney acted in anything but good faith. "To relieve the defendant of his duty of due diligence, the evidence of prosecutorial suppression should be clear and unequivocal. . . ." United States ex rel. Fein v. Deegan, *supra*, 410 F.2d at 20.

■ It is clear from the record herein that the prosecutor could fairly have concluded and did in fact believe that all the defendants were aware of the identity and location of the Canadians; and there was no deliberate suppression of information believed to be useful to the defense. These inferences can reasonably be drawn from the clear and unequivocal grand jury testimony of Maucelli and, more importantly, from that of the defendants Ignomirello and Kreshik themselves. Nothing in Kreshik's "demand" served to flag the prosecutor's attention to the fact that Kreshik desired the government to produce any evidence constituted by statements made by the Canadians to law-enforcement officers which might be partially inconsistent with the anticipated trial testimony of a government witness. The prosecutor, having decided not to prosecute the Canadians, and likewise not to call them as trial witnesses, had probably dismissed them from his mind by this juncture. It was incumbent upon Kreshik, if he took it upon himself to act at all, to jog the prosecutor's memory in this regard. Having failed to do so effectively (whether out of design or want of due care we cannot say) he will not now be heard to say that the prosecutor committed error by responding to a *pro forma* request with a reply in kind.

The prosecutor did not know of the existence of contradictory evidence which would cast doubt on the validity of Maucelli's discount evidence which was presented at trial. No contradictory evidence in fact appears in any of the 1969 statements.

The prosecutor had no reason to know that any defendant—particularly Kreshik—did not know the identity and whereabouts of the Canadians with whom Maucelli and Ignomirello negotiated.

9. Defendants Brawer and Ignomirello did argue forcefully to the jury that a negative inference should be drawn from the government's failure to produce the Canadians as witnesses. "If that actually happened and was not just another lie of this Maucelli, the perjurer, I wonder why, since the prosecution knew whom Mr. Maucelli was dealing with, whom he had conversations with, whom he had made these offers to, including the offer, as Mr. Maucelli states, of sixty-five—why didn't the prosecution bring that person here as a witness? If it happened, that would have been very important . . . They didn't bring anybody like that here. They could have. You are talking about the United States Attorney's Office. . . . Now, you know these people have unlimited funds, unlimited resources, unlimited powers of subpoena, and they could have brought these people here, but they did not. I will tell you why, in my opinion. It never happened."

It is important to remember that prejudice to the defendant is the criterion in applying *Brady;* there is none here.

The foregoing shall constitute the Court's findings and conclusions submitted pursuant to the remand of the Court of Appeals.

So ordered.