**UNITED STATES of America,**
**Appellee,**

v.

**Flora PURIN and Ernani Da Silva,**
**Defendants-Appellants.**

Nos. 157, 166, Dockets 73–1668, 73–1947.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1973.

Decided Nov. 7, 1973.

---

James P. Lavin, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., for the S. D. New York, John D. Gordan III, Asst. U. S. Atty., of counsel), for appellee.

Lawrence Stern, New York City (Rubin, Gold & Geller, New York City, of counsel), for defendant-appellant Purin.

John S. Martin, Jr., New York City (Martin & Obermaier, Abraham D. Sofaer, New York City, of counsel), for defendant-appellant Da Silva.

Before SMITH, MULLIGAN and OAKES, Circuit Judges.

MULLIGAN, Circuit Judge:

These are appeals from judgments of conviction by Flora Purin and Ernani Da Silva entered after a five-day trial before Hon. Charles L. Brieant, Jr., United States District Judge, Southern District of New York, and a jury. Purin was sentenced on March 23, 1973 to three years imprisonment on counts II and IV of a four count indictment, sentences to run concurrently. Count II charged Purin and a Paulo Romero with

distributing and possessing with intent to distribute approximately 27.75 grams of cocaine on September 9, 1971 and count IV with distributing and possessing with intent to distribute approximately 180.3 grams of cocaine on September 23, 1971 in violation of 21 U.S.C. §§ 812, 841. She was acquitted on count I which had charged a conspiracy with appellant Da Silva and Paula Romero.[1] Da Silva was convicted on count I charging the conspiracy to violate the federal narcotics laws. 21 U.S. C. § 846. He was sentenced on April 26, 1973 to eighteen months imprisonment.

The investigation which led to the arrest and conviction of the defendants was initiated by a New York City policeman, Michael Bergin, who was employed as a taxi driver during his vacation in April, 1971. One of his passengers, Da Silva, was unable to pay his taxi fare and asked Bergin to stop at his store on MacDougal Street to get paid. On August 31, 1971 Bergin and his partner Perrigo, a Bureau of Narcotics and Dangerous Drugs (BNDD) agent, both working undercover for the New York Joint Task Force, visited Da Silva's store and stated that they were in the cocaine business and wanted a connection. Da Silva said that he thought he could line something up and asked them to call the store later that night. He gave them an envelope with the name "Lenny" written on it which he said was the name he was then using and also the telephone number of the store. Later that evening Bergin and Perrigo returned to the store. Da Silva made a phone call in their presence in a foreign language, intermittently speaking English to the agents. He quoted a price of $800 an ounce to them and when they indicated it was too high, he assured them that it was cocaine of good quality and would take a good "cut". The agents agreed to the price and suggested that they start out with a three ounce purchase. Da Silva set a date for them

1. Count III charged Romero with possessing and distributing 23.45 grams of cocaine on September 16, 1971. On May 25, 1972, Romero pleaded guilty to counts II and III of the indictment. Counts I and IV were dismissed at the time of his sentencing.

to return to the store on the afternoon of September 8th. At the appointed time, the agents returned. Da Silva said he didn't have the cocaine yet, made a call to a "Paulo" and asked them to come back. Later that night when they returned to the store, Da Silva introduced them to Paulo Romero who said he didn't have any cocaine then but gave the agents his phone number. The following day the agents called Romero and obtained his address. They visited his apartment on West 77th Street where he said he had made arrangements for a delivery of an ounce of cocaine later that evening for $800. On their return Romero directed them to drive to 15 West 72nd Street for a sample. Romero told them to drive around for 15 minutes and then entered the building. Thereafter, Romero advised that no sample could be obtained since his contact did not wish to split up the package. When the agents refused to buy, Romero returned to the apartment and secured a sample which passed muster. Perrigo then accompanied Romero to the 16th floor of 15 West 72nd Street where they were met in the hall by Flora Purin who apologized for the precautions that had been taken but stated that she had to be careful due to the police and narcotics agents. Purin led Perrigo and Romero to a landing between the 15th and 16th floors and pulled out a brown paper bag containing the cocaine from behind a fire hose. Perrigo testified that Purin told him that if he wanted any more cocaine, he was to call Romero who would get in touch with her.

On September 15, 1971 Bergin and Perrigo again returned to 15 West 72nd Street. Perrigo went to Purin's apartment and indicated his interest in cocaine. She said that she was not interested, had none available but suggested he call again. Purin's husband Airto Moreira, arrived at the apartment and said that he knew of the prior sale. Moreira objected to cocaine and ordered Perrigo to leave. The following day Romero agreed to sell Bergin and Perrigo another ounce for $900. After testing a sample, the sale was made in Romero's apartment. It was then determined that the quantity was short and Romero stated that he would get a makeup package from his source. Romero was observed to proceed to 15 West 72nd Street and after 15 minutes, returned to his own apartment where the balance of the cocaine was delivered.

On September 23 Romero advised Bergin that he could obtain eight ounces of cocaine from the same girl from whom he had gotten the drugs before, at $900 an ounce. After waiting in Romero's apartment without success, Bergin and Perrigo left. Later in the evening Romero advised Bergin on the telephone that the girl had arrived. The officers then returned to Romero's apartment where Purin appeared. She advised Perrigo that procaine was a good cut for cocaine since it maintained the quality of the coke. She advised the officers not to talk if they were ever arrested but to contact Romero who would get them counsel. She said that she would make up any shortage in the cocaine and removed from the apartment refrigerator, a green plastic bag containing eight ounces of cocaine. Perrigo pocketed the cocaine and Bergin said he had to go downstairs to get the $7200 from his car. On his return other officers entered the apartment and made the arrests of Purin and Romero.

Purin took the stand in her own defense and substantially testified that she had been with Romero only because of a clandestine love affair. She admitted using drugs with Romero but maintained that she had stopped and denied that she was a source. Da Silva did not testify.

### A) Purin

■ On appeal Purin's major contentions involve alleged errors in the admission of evidence. At the time of her arrest Purin was searched in the bathroom of the apartment and the policewoman who made the search found a package of about two grams of cocaine in her brassiere. Purin concededly was not indict·

ed for the possession of this drug. At the close of its case, the Government sought to introduce this package as part of its direct evidence. This was objected to on the ground that it was evidence of an uncharged crime and that it was prejudicial. The Government argued that it was relevant to establish that Purin had access to drugs. The trial judge excluded the testimony but announced that he would permit inquiry on cross-examination depending on Purin's testimony. After she had testified, the trial judge stated that he would admit the evidence unearthed by the search since Purin's testimony on cross-examination was that she had stopped using cocaine before her arrest. The evidence was therefore admitted on rebuttal. Appellant argues that since there was no prior notice of the claimed brassiere cocaine, there was no opportunity for a suppression hearing to establish that the drugs were illegally seized. The trial court proceeded on the theory that whether the drug package was seized legally or not, it was admissible under the rule of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

We see no merit at all in the appellant's position that an evidentiary suppression hearing should or would have been appropriate with respect to the brassiere cocaine. It is most significant that there was no effort at all by Purin to suppress the eight ounces seized in the apartment at the same time which were the basis for count IV of the indictment. The officers had a warrant and there was clear probable cause to arrest Purin in any event. The search was made by an officer in the course of an arrest and was clearly lawful. Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Defendant Purin suggested on surrebuttal that the officer picked up the package from the bathroom floor and did not pluck it from her person. Since the searching officer was lawfully present and the package was in plain view even under this version of the facts, it was not illegally seized. See Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); United States v. Santana, 485 F.2d 365, 366–370 (2d Cir., 1973). There are no facts in the record before us or urged on appeal which would justify an evidentiary hearing, and no claim of an illegal search was ever raised. See United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969), cert. denied, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970); Grant v. United States, 282 F.2d 165, 170 (2d Cir. 1960).

■■ Under the circumstances here therefore we believe that the trial court could properly have admitted the brassiere cocaine on the Government's direct case. The Government could reasonably anticipate what in fact Purin's defense attempted to establish: that she was an innocent bystander, no longer a cocaine user, and present in Romero's apartment because of her infatuation for him and not because of her interest in drug trafficking. United States v. Wright, 466 F.2d 1256, 1258–1259 (2d Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973); United States v. Deaton, 381 F.2d 114, 117 (2d Cir. 1967). The admission of this evidence in rebuttal does not constitute reversible error. The fact that it was admitted in rebuttal rather than on direct is not significant. It was relevant and probative and its admission in rebuttal was within the discretion of the trial judge. United States v. Glaziou, 402 F.2d 8, 16 (2d Cir. 1968), cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). The evidence against Purin with respect to both the September 9th and September 23rd sales of cocaine was overwhelming.

■ On rebuttal, the Government introduced into evidence the testimony of an officer Holden to the effect that after her arrest, Purin asked why she had been arrested. When told that it was for narcotics, she stated "It's the two guys that just left [presumably Perrigo and Bergin] that brought the cocaine to the apartment. I swear to God, I never saw cocaine in my life." The trial court admitted this testimony as a

false exculpatory statement which had independent probative value.[2] There is no question of the admissibility of such statements either on the Government's direct case (United States v. Tropiano, 418 F.2d 1069, 1080–1081 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S. Ct. 1262, 25 L.Ed.2d 530 (1970)) or in rebuttal (United States v. Kilpatrick, 458 F.2d 864, 866–867 (7th Cir. 1972)). Appellant urges on appeal that the statement was given without *Miranda* warnings and was therefore inadmissible.

During trial the Government advised the court and defense counsel that the statements were volunteered and not the result of police inquiry and that no *Miranda* warnings had been given. The trial court granted a recess and although counsel was given the opportunity to question Purin, and the issue was presented a day later on cross-examination when Purin denied making the statement, no *Miranda* question was raised. In fact, on rebuttal, when Officer Holden testified to the statements only a general objection was made. In view of the failure of the appellant to specifically raise the *Miranda* point on trial, the question cannot be raised for the first time on appeal. United States v. Bryant, 480 F.2d 785, 791–793 (2d Cir. 1973); United States v. Bell, 464 F.2d 667, 674 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972).

There is nothing in the record to indicate that the statements made were not voluntary and they were therefore properly admitted. Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States v. Tafoya, 459 F.2d 424, 427 (10th Cir. 1972);

United States v. Augello, 452 F.2d 1135, 1141 (2d Cir. 1971), cert. denied, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 & 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972); Parson v. United States, 387 F.2d 944, 946 (10th Cir. 1968). See also United States v. Vigo, 487 F.2d 295, 298–299 (2d Cir., 1973).

 Purin did serve a subpoena *duces tecum* on the United States Immigration and Naturalization Service, directing the production of its files on Romero. The trial judge advised counsel that the Service had insisted that the file not be made available for examination. However, he inquired as to the reason Purin sought the file and was advised that it would be used to impeach Romero if he was called as a Government witness and if not called by the Government, there was a strong possibility that Romero might be called as a defense witness. The trial judge stated that if this occurred, he would make available whatever material could be used properly on either direct or cross-examination. Romero, although available, was not called as a witness by either side and therefore the offer of the trial court never became an issue. It is difficult to imagine how Purin was denied a fair trial because of the refusal of the trial judge to permit a fishing expedition. A subpoena *duces tecum* in a criminal case is not intended as a means of discovery. Its purported relevancy was alleged to be dependent upon Romero's appearance as a witness and that never occurred. United States v. Marchisio, 344 F.2d 653, 669 (2d Cir. 1965).

Purin also raises questions as to the propriety of the trial judge's charge here which we consider to be entirely without substance.

---

2. Defense counsel claimed surprise when the Government informed them of Purin's statements as they did when the Government sought to introduce the cocaine seized from Purin's brassiere. Even where evidence falls within the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), however, the Government need not *sua sponte* give notice to the defense where the accused has knowledge of the evidence

(Wallace v. Hocker, 441 F.2d 219, 220 (9th Cir. 1971); see United States v. Soblen, 301 F.2d 236, 242 (2d Cir.), cert. denied, 370 U. S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962)) and here no pretrial discovery motions were made. In any event, the Government's aborted attempts to introduce the evidence on its direct case did give the defense a full day's time to prepare.

## B) Da Silva

Appellant Da Silva's principal argument on appeal is that the evidence was insufficient to establish that he was a conspirator with Romero and Purin. Looking at the evidence most favorable to the Government (Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Tutino, 269 F.2d 488, 490 (2d Cir. 1959)), we are persuaded that there was adequate evidence here to establish his participation in the conspiracy. We have no quarrel with the general proposition advanced by appellant that a mere willing participation in acts with alleged co-conspirators, knowing in a general way that their intent was to break the law, is insufficient to establish a conspiracy. United States v. Falcone, 109 F.2d 579 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); United States v. Peoni, 100 F.2d 401 (2d Cir. 1938). However, the facts here clearly establish that Da Silva was a knowing and willing participant in the sale of cocaine. When Bergin and Perrigo first approached Da Silva, he was advised not that they were users but rather that they had started "a cocaine business" and were "looking for a connection." He made the initial contact with Romero and was more than a mere casual conduit. He extolled the quality of the cocaine, negotiated the price and attempted to consummate the deal in his store.

The fact that Da Silva was not present with Purin or Romero when the actual sale was transacted or that there was no evidence to establish that he knew Purin, is not significant. United States v. Bynum, 485 F.2d 490, 495 (2d Cir. 1973); United States v. Calabro, 467 F.2d 973, 982–983 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973). The claim is made that Da Silva was simply doing a casual favor for a friend and was not therefore a conspirator. The conspiracy charge given was proper,[3] and in fact was repeated at the request of the jury. They could properly infer that Da Silva had a stake in the venture and that his relationship was not peripheral. The furtive maneuvering by Romero and Purin strongly support the testimony of their expressed fear of apprehension by agents. Yet Da Silva had no difficulty making direct contact with Romero not simply to supply the wants of a user but the purported proprietors of a cocaine business. The jury was entitled to infer that Da Silva's relationship to the cocaine ring was sufficiently intimate to come within the charge given.

We find no substance in the claim that Da Silva's trial should have been severed. The trial judge initially offered a separate trial for Da Silva which was rejected by his trial counsel who feared that his role would be exaggerated if he were tried alone. The fact that the tactic was not successful is surely insufficient grounds for reversal.

We have considered appellants' other arguments and find them all to be without merit.

Affirmed.

---

3. See generally United States v. Hysohion, 448 F.2d 343 (2d Cir. 1971). The trial judge instructed that a defendant to be guilty of conspiracy "must, in some sense, promote the venture himself, make it his own or have a stake in the outcome." He further instructed:

The defense contends Da Silva was not participating in a conspiracy with Purin or Romero, if there was any, and that he was merely trying to accommodate the undercover agent who had done him a favor in the past by trusting him for an unpaid taxi fare, by putting the agent in touch with Romero to get cocaine.

Well, just doing this . . . wouldn't of itself, if you find that that's all he did, constitute knowing participation in a conspiracy.