**UNITED STATES of America,**

v.

**Joseph MORALES, Defendant.**

**No. S2 95 Cr. 52 (LAK).**

United States District Court, S.D. New York.

Feb. 27, 1996.

Tai H. Park, Assistant United States Attorney, Mary Jo White, United States Attorney, for the United States of America.

David Cooper, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The superseding indictment in this case charged a number of defendants with conspiring to smuggle Thai women into the United States illegally and, upon their arrival, to force them to work as prostitutes at a brothel located at 206–208 Bowery, New York, New York, until they had performed sexual acts with customers, for the economic benefit of the smugglers, to an extent sufficient to satisfy the sums they had agreed to pay the smugglers to bring them into the country. All the defendants pleaded guilty to various charges except Joseph Morales, a former New York City Corrections Officer who was employed as chief of security at the brothel. Morales was convicted after trial of participating in conspiracies to kidnap, to violate the civil rights of women held at the brothel, and to import and transport women interstate for the purpose of promoting prostitution as well as with six substantive civil rights and importation counts. The kidnaping conspiracy conviction was set aside when the government consented to defendant's Rule 29 motion addressed to that count. Morales now moves for a new trial on the grounds that the government (1) suppressed material *Brady* information, and (2) knowingly adduced perjured testimony at trial.

**338**

*The* Brady *Claim*

The *Brady* claim arises as a result of testimony by two alleged victims of the scheme at a *Fatico* hearing held in connection with the sentencing of two of his co-defendants after Morales was convicted. Neither witness testified at Morales' trial. Before proceeding to the details of the testimony and its significance in light of *Brady*, it is useful to outline the case against Morales and his defense.

The theory of the government's case was that a number of smugglers arranged to bring women into the United States illegally from Thailand in exchange for promises of payment by the women. Some knew before they came that they would be required to pay off their debts by working as prostitutes. Others were misled by promises of legitimate jobs. Once they arrived, however, all were confined at the brothel until they had serviced sexually, for the economic benefit of their smugglers or "bosses," sufficient men to pay the fees for bringing them into the country. (TT[1] 15–16) In substance, then, the government claimed that those who had agreed to work off their debts as prostitutes were prevented from changing their minds while the others were forced into prostitution against their will. Morales' role, as indicated, allegedly was that of chief of security— the man in charge of making sure that none of the women left the premises.

Morales' defense was that most of the women were prostitutes in Thailand and that all of them knowingly agreed, in arrangements to which Morales was not a party, to work off their debts as prostitutes and to remain in the brothel until they had done so. Morales contended that he did not prevent any of the women from leaving the brothel. (TT 32–45)

The government's proof at trial consisted principally of the testimony of Siew Geok Adkins, a/k/a Lilly Chan, the madam of the brothel; Jawarit Sillaphanond, a/k/a Lek, one of the smugglers; Sonchay Khounsavanh,

a/k/a Sam, a customer of the brothel who, after losing his job elsewhere, worked there briefly before the brothel was closed; and Sunan Chalremsen, one of the alleged victims. The evidence, considered in the light most favorable to the government, established that (1) Chalremsen and others were induced to enter into arrangements pursuant to which they would be smuggled into the country in exchange for a promise to pay the smugglers from their earnings after they arrived here, (2) some, but not all, were misled by promises of legitimate jobs here while others knew they would be engaged in prostitution, (3) upon arrival, all of the women were confined to the brothel until they had serviced sexually enough men to satisfy the smuggling debts, (4) Morales was the chief of security at the brothel and was responsible, both personally and through others he hired and paid, for ensuring that none of the women escaped, (5) Morales on one or more occasions physically prevented women from leaving the brothel, and (6) on one occasion Morales offered to assist Adkins in capturing a woman who had succeeded in escaping.

The two women who testified at the *Fatico* hearing were Valaïborn Yeampunnai, a/k/a Jang, and Kwanjai Hasubklong, a/k/a Dee. Yeampunnai testified that she was anxious to come to the United States and, in exchange for being smuggled into the country, agreed to have sex with four to five hundred men for the benefit of her smuggler. (FT[2] 9–10) She was brought to 208 Bowery, where she remained for two weeks. She understood that she was not allowed to leave in the absence of her "boss" and that the door of the brothel was locked. (*Id.* 13) Although she wished to leave, she said she was afraid that she would be killed if she left.[3] (*Id.* 14–15) She acknowledged also that when first questioned by authorities, she falsely told them that she had been told that she would work in a restaurant when she came to the United States because she was afraid that

---

1. "TT" refers to the trial transcript.

2. "FT" refers to the transcript of the *Fatico* hearing.

3. She testified also, somewhat inconsistently, that she never asked to leave the brothel because she did not know why she would wish to. (FT 13)

she would be deported if she admitted having come to work as a prostitute. (*Id.* 17–19)

Hasubklong's testimony was similar. She admitted having agreed to work as a prostitute in exchange for her passage and entry into the United States. (*Id.* 42) She was locked in the Bowery brothel, which she could not leave without Adkins' permission. (*Id.* 44–45) Hasubklong, however, became concerned that the brothel might be raided and that she would be deported because she was a prostitute. In consequence, she asked a customer, whom she later married, to call the police on her behalf and, in the hope of thus avoiding deportation, to tell them she was being forced to work as a prostitute. (*Id.* 46–47, 55–56) When asked why she did not just walk out of the brothel, she responded, "Where can I go because I don't know anybody." (*Id.* 56)

Morales contends that the statements of these women, which he assumes the government had at the time of his trial, were *Brady* material that should have been disclosed. He argues that they support his contentions that he had nothing to do with the arrangements between the women and the smugglers, that the women were not compelled to work as prostitutes but freely chose to do so, that the women agreed to their confinement, and that he did not prevent them from leaving the brothel—indeed, they did not seek to do so. He contends also that Hasubklong's testimony was inconsistent with the government's theory that the women who spoke to the police did so to escape the allegedly inhuman conditions at the brothel, showing instead that they did so in an effort to avoid deportation.

■ In order to establish a *Brady* violation, the defendant must show, *inter alia*, that (1) the government suppressed favorable evidence, and (2) the evidence the government suppressed was material. *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). A defendant, however, cannot satisfy the suppression requirement if the defendant, directly or through counsel, "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). If the defendant has information, but fails to use due diligence to make use of it, the defendant cannot later claim that the government "suppressed" evidence. *Id.* Here there is no colorable basis for any claim of suppression, even assuming that the government knew at or before trial how Hasubklong and Yeampunnai would testify. Accordingly, there is no need to determine whether the statements of those witnesses were exculpatory or material.[4]

■ In order to appreciate fully the weakness of the suppression charge, it is helpful to understand how this case evolved. The brothel evidently came to the attention of federal authorities on October 11, 1994 as a result of an inspection conducted by New York City authorities. Agents of the Immigration and Naturalization Service responded to the scene, where they found and interviewed thirty-one Thai women. It appears that three then claimed to have been held against their will while the other twenty-eight declined to be further questioned. (Ng Aff.[5] ¶ 7) On November 6, 1994, six additional women claimed that they were being held against their will and were removed from the brothel. (*Id.* ¶ 11) Adkins then was arrested and charged. (*Id.*) The case developed from that point, resulting in the superseding indictment on which Morales ultimately was tried.

---

4. It is worth noting, however, that there is at least one major obstacle to concluding that these witnesses' statements were exculpatory of Morales. Both testified that they were locked into the brothel and could not leave without permission. This is perfectly consistent with Morales' guilt, as Morales' alleged role was to ensure that the door was and remained locked. The fact that the witnesses did not address Morales' role, one way or the other, cannot be regarded as exculpatory in view of the fact that their testimony came at a *Fatico* hearing that dealt with defendants other than Morales.

5. Refers to affidavit of Wai Ng, sworn to Dec. 30, 1994, submitted in support of application for search and arrest warrants. A copy of the affidavit is Exhibit 3 to the affirmation of Tai H. Park, dated Apr. 28, 1995, submitted in opposition to pretrial motions by other defendants.

Given the nature of the charges, it was perfectly obvious from the outset of this case that testimony of women who had been at the brothel could be vitally important to one side or the other. Indeed, when a newspaper reported on or about February 1, 1995 that a raid on a brothel in Seattle, Washington, had netted Thai women who may have been held against their will, the Assistant United States Attorney promptly investigated the matter and learned that three of the women had stated that they were from New York and claimed that they had not been held against their will. (Park Aff., Apr. 28, 1995, ¶ 5) He promptly informed defense counsel (*id.* ¶ 5c), one of whom unsuccessfully claimed that his client's *Brady* rights had been violated because he had not been informed earlier, a delay which allegedly had allowed the three women to disappear (Tr., May 11, 1995, at 47–57). At about the same time, the government advised defense counsel that certain of the alleged victims who initially had told the government that they had not expected to engage in prostitution when they came to the United States had changed their stories. (Park Aff., Feb. 9, 1996, Ex. 1) Moreover, counsel for one of Morales' co-defendants moved—in the presence of Morales and his counsel—for an order barring the government from interfering with defense efforts to speak with the thirty-one women (Tr., May 11, 1995, at 35), thus evidencing his view that these women were key objects of defense interest. Indeed, he stated that he had interviewed nine of the thirty-one, all of whom had given exculpatory evidence. (*Id.* 39–40) Accordingly, by mid-May 1995, the defense knew that (1) the charges depended in significant part on what the women were told before they arrived at

the brothel and what happened to them when they got there, (2) only three of the thirty-one women at the brothel on October 11, 1994 then claimed to have been held against their will, (3) six more so alleged in early November, (4) three women who had been interviewed in Seattle had said that they had not been held against their will, (5) the government acknowledged that alleged victims had changed their accounts,[6] and (6) nine women interviewed by co-counsel supposedly had exculpated one of Morales' co-defendants.

Against this background, Morales' counsel not surprisingly asked the government to identify witnesses whom it did not intend to call on its case in chief. Taking the request as seeking the names of alleged victims to whom the government had access and whom it did not intend to call, the government promptly supplied a list of seven women including both Hasubklong and Yeampunnai. (Park Aff., Feb. 9, 1996, Ex. 2) Morales' counsel contacted the attorney for one of the seven,[7] who advised that his client would not speak to Morales' counsel because she was afraid of being deported or prosecuted. Assuming that he would meet the same response from all of the others, Morales' counsel made no effort to contact any of them. He called none at trial. He did not raise the question whether the government would immunize the women to testify for the defense as counsel for a co-defendant suggested. (*See* Tr., May 11, 1995, at 42) Instead, he made a good deal in his summation of the government's failure to call them.[8]

As the government disclosed well before trial that Hasubklong and Yeampunnai were among the women who had been in the brothel, the only possible claim of suppres-

---

**6.** It was not clear from the government's letter whether the women referred to were the same as those whose stories had changed in the October–November period or additional women.

**7.** Counsel has not identified which of the seven he tried to contact.

**8.** "Look at the proof we had in this case, ladies and gentlemen. 31 women were interviewed by the government in connection with this incident at 208 Bowery, and one of them appeared as a witness here. Where are the rest of them? I don't know. You don't know. But at some point

in this case the government knew where they were.

"They were all illegal aliens. They were subject to the authority and control of the immigration authorities. One of these 31 women came to this court to talk about what happened in 208 Bowery, and what did she say about Joe Morales? Well, I saw him twice, once he took some girls out—turns out they went on a trip to Statue of Liberty. And another time I saw him, and I don't know what he was doing because I didn't even notice. Must have been something real important, like locking people up." (TT 669)

sion rests on the failure to tell Morales that Hasubklong and Yeampunnai, if called, would testify as they did at the *Fatico* hearing, assuming of course that the government then knew that. The Court is persuaded, however, that any failure to do so, in the circumstances of this case, did not amount to suppression.

Morales well knew that women who had been at the brothel had told different stories about what had taken place—the government had disclosed that fact. He had the names of these women. He simply chose not to pursue the evidence. Perhaps he believed he would be unsuccessful in obtaining it. Perhaps he believed the evidence would be unfavorable. Perhaps he believed that the missing witness argument he made to the jury would be better than any evidence he was likely to find. But whatever the reason, he cannot now blame the government for the consequences.

*United States v. Ruggiero*, 472 F.2d 599 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973), is instructive. The defendant there was denied pretrial disclosure of the grand jury testimony of two prospective witnesses, Lundy and Sheridan, after *in camera* inspection by the trial court. Neither was called at trial. On appeal, he contended that the failure to turn over the grand jury testimony violated *Brady*. But the Court of Appeals rejected the argument:

> "The purpose of the *Brady* rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him. *Here the appellant was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as Lundy and Sheridan might furnish.* He was also well aware of the process by which they could be compelled to testify at trial. * * * If appellant wanted their testimony, the obvious and logical course was to subpoena them and put them on the witness stand." *Id.* at 604–05 (emphasis added).

The Court, moreover, rejected the defendant's argument that he should not be expected to have called the witnesses blind and "guess as to what they will say on the stand ..." *Id.* at 605. It pointed out that the defense had been free to seek to interview Lundy and Sheridan before trial, and it rejected his contention that his effort to do so had been rebuffed because "neither the government nor the trial judge was so advised." *Id.* It concluded:

> "[D]efense counsel had strong reason to believe that Lundy's testimony would be helpful to the defense and he so argued to the jury. Yet he did not subpoena Lundy to testify, as he had a right to do, and he did not advise the court of any inability to elicit Lundy's testimony. We hold that under the circumstances it was not an abuse of discretion for the trial judge to deny him disclosure of the Lundy–Sheridan grand jury testimony." *Id.*

There is, to be sure, a difference between *Ruggiero* and this case in that the trial court there reviewed the grand jury transcripts *in camera*. But the important point, for purposes of this case, is the Court's reaction to the defendant's failure to pursue the testimony of Lundy and Sheridan. In *Ruggiero*, the defense had reason to believe that the testimony would be helpful, and the defense here certainly knew that the testimony of these witnesses might be helpful. In *Ruggiero*, the defense at least tried to interview the witnesses in advance, although it did not inform the government or the court of its lack of success. Here, with one exception, the defense did not even seek to interview the witnesses. In both cases, the defense decided not to call the witnesses. *Ruggiero*'s rejection of the *Brady* argument therefore strongly supports the government's position that there was no suppression in this case. *See also Williams v. United States*, 503 F.2d 995, 998 (2d Cir.1974); *United States v. Tramunti*, 500 F.2d 1334, 1349–50 (2d Cir.), *cert denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *cf. United States v. Purin*, 486 F.2d 1363, 1368 n. 2 (2d Cir.1973), *cert denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974).

*United States v. Griggs,* 713 F.2d 672 (11th Cir.1983), also is pertinent. The defendant in that case was charged with conducting a fraudulent scheme. He made a pretrial *Brady* motion, but the government denied the existence of any such material although it provided a list of witnesses it intended to call at trial. The defendant was convicted at trial, although the defense elicited arguably exculpatory testimony from several of the government's witnesses.

The defendant sought a new trial on the ground that the government's failure to disclose before trial the exculpatory statements elicited by the defense on the witness stand violated *Brady.* The Eleventh Circuit rejected the argument:

"Where defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government. 'Irrespective of whether the statement[s] here [were] exculpatory evidence under *Brady,* a question we do not reach, there is no *Brady* violation when the accused or his counsel knows *before* trial about the allegedly exculpatory information....' *United States v. Cravero,* 545 F.2d 406, 420 (5th Cir.1976) (Emphasis added).

"Pretrial, defendants were given the list of potential government witnesses and had within their knowledge the names of all former employees of their companies from whom the allegedly exculpatory information was extracted at trial. Accordingly, while the better course may have been for the government to disclose the statements if it had knowledge thereof, no new trial is warranted for failure to do so." *Id.* at 674.

*See also United States v. MacDonald,* 778 F.Supp. 1342, 1353 (E.D.N.C.1991) (nondisclosure of forensic laboratory notes not *Brady* violation where government turned over physical evidence for defense testing).

The Court assumes that *Brady* requires more than giving a defendant pieces of a jigsaw puzzle which, with sufficient effort, can be joined to reveal an exculpatory picture. But it is unnecessary to test the limits of that concept in this case. Here, the possibility—indeed, if one believed either the as-

sertions of Morales' co-defendant at the May 11, 1995 motion hearing or Morales' defense, the likelihood—that women who had been in the brothel would have had exculpatory evidence was as patent as it could have been. There was nothing difficult about pursuing the evidence. In such a clear situation, the Constitution required no more than the government did.

*Alleged Perjury*

■ Morales charges the government also with deliberately presenting perjurious testimony. Specifically, counsel's affidavit states that Khounsavanh, "testified at trial that he had ceased to use drugs as long ago as 1979." (Cooper Aff. ¶ 11) This, counsel says, was false because counsel allegedly has learned "from an excellent source" that Khounsavanh abused controlled substances while cooperating with the government. The basis for the assertion that the government knew it was false is (1) counsel's contention that he confronted the prosecutor with the information and that the prosecutor "did not seem to be surprised" and said that Khounsavanh's abuse "appeared to be no more than smoking marihuana," (*id.*) a contention that the prosecutor denies (Park Aff., Feb. 9, 1996, ¶ 5), and (2) Khounsavanh's demeanor, which Morales argues put the government on notice that he was using drugs at the time of the trial. The claim is frivolous.

■ To begin with, Morales has presented no evidence that Khounsavanh's testimony was false. An unsubstantiated statement by an unidentified informant affords no reason even to conduct a hearing as to whether perjury occurred. *See United States v. Johnson,* 142 F.2d 588, 592 (7th Cir.1944) (affidavit of witness to newly discovered evidence must be produced or its absence explained); *United States v. Stahls,* 194 F.Supp. 849, 850–51 (S.D.Ind.1961) (same); 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 557.1, at 344 (2d ed. 1982); *cf. Kyle v. United States,* 297 F.2d 507, 512 (2d Cir.1961), *cert. denied,* 377 U.S. 909, 84 S.Ct. 1170, 12 L.Ed.2d 179 (1964) (*Larrison* rule applies in cases of recantation or where "it has been proved that false testimony was given at trial"); *United States v. Hiss,* 107 F.Supp. 128, 136 (S.D.N.Y.1952),

*aff'd,* 201 F.2d 372 (2d Cir.), *cert. denied,* 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953).

Second, Khounsavanh's testimony was not exactly as recounted by Morales' counsel. Khounsavanh testified as follows:

"Q Mr. Khounsavanh, have you ever used any form of drugs. A I used crack.

"Q How long ago? A 1979 to 1980, and I quit, you know.

"Q Anything else? A And some marijuana.

"Q Marijuana? A Yes. And that also quit too." (TT 409)

Khounsavanh thus said he had stopped using crack long ago, but he did not say when he quit using marihuana. In view of the fact that counsel's alleged source did not identify the kind of drugs Khounsavanh allegedly was using and did not even allegedly say that he was using drugs during trial, Khounsavanh's testimony is not necessarily inconsistent with what the alleged source supposedly told counsel.

 Third, even if there were an inconsistency between Khounsavanh's testimony and some evidence of substance, there would be no basis for a new trial. The introduction of perjurious testimony requires a new trial only if the prosecution knowingly permitted its introduction, in which case reversal is "virtually automatic," or it was material to the verdict. *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991).

Here, any false testimony was not material. Khounsavanh's testimony was not the "linchpin" of the government's case against Morales (Def.Mem. 4) that Morales claims. The key witness against Morales was Adkins, the madam of the house, who said that she hired Morales as chief of security and described his activities. (TT 64–67, 78–82, 103–06, 121–22, 128–29, 210–12) Khounsavanh served principally a corroborating purpose. The Court believes that Morales would have been convicted even if the alleged perjury regarding Khounsavanh's drug use, if indeed that occurred, had been revealed. *See Wallach,* 935 F.2d. at 456.

The assertion that the prosecution knowingly permitted the introduction of false testimony is charitably described as far fetched.

The principal support offered for the assertion is the suggestion that "Sam's somewhat odd affect on the stand may be related to his having been under the influence of drugs when he testified." (Cooper Aff. ¶ 11 n. 4) The Court saw no indication from Khounsavanh's demeanor that he was under the influence of drugs. Far more important, however, is this: if Khounsavanh's demeanor should have suggested drug use to the government, it should have suggested drug use to the defense. The fact that Morales' counsel did not cross-examine on that issue is a persuasive refutation of his contention.

*Conclusion*

For the foregoing reasons, the motion for a new trial is denied in all respects.

SO ORDERED.