**Joseph MORALES, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 98 Civ. 1880(LAK).**

United States District Court, S.D. New York.

Oct. 30, 1998.

Michael Young, for Petitioner.

Sharon D. McCarthy, Assistant U.S. Attorney, Mary Jo White, U.S. Attorney, New York City, for U.S.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Petitioner Joseph Morales was convicted in this Court on nine counts of conspiracy to deprive others of their Thirteenth Amendment right to be free of involuntary servi-

tude, substantive offenses of depriving others of that right, conspiracy to import and harbor aliens for purposes of prostitution and to transport individuals in foreign commerce with the intent that they engage in prostitution, and substantive offenses of harboring illegal aliens for the purpose of prostitution. His motion for a new trial was denied in 1996,[1] and his conviction was affirmed by the Court of Appeals in 1997. He now seeks to set aside his conviction and sentence under 28 U.S.C. § 2255 on a plethora of grounds, most of which already have been rejected in an unpublished order dated August 12, 1998. Remaining for decision following an evidentiary hearing are Morales's contentions that he was deprived of the effective assistance of counsel because his trial counsel failed to (1) call Morales as a witness in his own defense, (2) present exculpatory witnesses at trial, and (3) properly investigate the case. This order contains the Court's findings of fact and conclusions of law following the hearing.

## I

■ Morales's contention that trial counsel was constitutionally ineffective because he failed to call Morales as a witness in his own defense is utterly without merit. The trial record shows that Morales's counsel opened to the jury on the premise that Morales would testify on his own behalf. Indeed, trial counsel and Morales both testified that they intended and expected when the trial began that Morales would be called to the stand. Morales, however, maintains that, when the government rested its case, his trial counsel simply rested without calling Morales and without any further discussion of the subject. Trial counsel, on the other hand, testified that Morales during the government's case told him that he did not wish to testify. According to trial counsel, he then advised Morales that he had opened on the premise that Morales would be a witness, that it would be helpful to Morales's case for him to take the stand, and that counsel wanted the jury to see Morales, who he regarded as an "innocent" and not a mean or violent person. Morales nevertheless persisted, and counsel acquiesced in his decision.

The Court credits trial counsel's account of these events and rejects Morales's. In doing so, it relies both on its assessment of the demeanor and credibility of the two witnesses and on the logic of the situation. Having opened on the premise that Morales would testify, there simply is no explanation for why counsel would have failed to call him absent a change of heart by Morales that is credible to this Court in any meaningful way. Hence, Morales, who concededly was aware of his right to testify in his own behalf, made a knowing and deliberate waiver of that right. Ground II of the Section 2255 motion is baseless.

## II

Morales's two remaining grounds both involve claims that Morales's trial counsel improperly failed to present exculpatory evidence. Morales contends first that he identified three former brothel employees to his counsel, each of whom allegedly met with counsel and indicated that they would testify in substance that Morales was ignorant of the fact that the women in the brothel were being held against their will, yet counsel failed to call them at trial. He contends also that he told defense counsel, and counsel in any case knew, that some of the women who had been at the brothel had told others that they had not been held against their will but that counsel failed to make any serious attempt to interview the women or call them as witnesses at trial.

*The Facts*

*The Former Brothel Employees*

■ At the outset, there is some uncertainty as to whether all of these individuals— Freddy, Tony and Mr. Matthews—actually existed. Defense counsel testified at the hearing that he recalled having met only with one brothel employee, an individual named Freddy whom he decided not to call because Freddy was ambivalent about what he had known concerning illegal activities at the brothel, had a criminal record, was collecting some form of government benefits for which

1. *United States v. Morales,* 916 F.Supp. 336 (S.D.N.Y.1996).

he was rendered ineligible by his employment, and in counsel's view would have made a poor impression. But counsel's recollection was flawed at least to the extent that he had no recollection of Matthews despite the fact that he applied to the Court for CJA funds to fly Matthews to New York to testify.

Morales tells a different story. His petition refers only to Matthews who, he said, "sat in the courtroom through the whole" trial, would have testified that defendant did not know what was going on at the brothel, but was not called. At the hearing, Morales identified "Tony" as an exculpatory witness for the first time and added that the person described in the petition was not Matthews, but Freddy. He claimed, moreover, that Freddy did not have a criminal record—that distinction belonged to Tony.

Having considered the conflicting accounts, the Court·finds that there were two prospective former brothel employee witnesses—Freddy and Matthews. Neither of them sat in the courtroom during the trial.[2] It is not persuaded that anyone named Tony was identified to Morales' counsel as a prospective witness.

The next question is why counsel failed to call Freddy and Matthews. According to Morales' petition, counsel failed to call Matthews, later changed by Morales to Freddy, because counsel forgot. Counsel, who had no recollection of Matthews, testified that he did not call Freddy for the reasons outlined above. He testified further than once Morales decided late in the trial not to testify himself, counsel would not have called any but the most impressive and conclusive of witnesses because the calling of an inconclusive witness in the face of Morales' refusal to testify after an opening that assumed his presence simply would have called attention to Morales' absence, undermined the defense's ability to rely on its lack of any obligation to offer any evidence, and thus prejudiced the defense case.

The Court credits counsel's testimony as to the reason for his failure to call Freddy. Moreover, it is readily apparent that these witnesses, even if they were prepared to say that Morales did not know what was going on at the brothel, had very substantial problems. First, it is doubtful that their assumed testimony concerning Morales' state of mind would have been admissible in evidence. Second, both Freddy and Matthews, according to Morales, held the same job that Morales claims to have held—bouncer. Whatever they may have said to Morales or his lawyer before trial, it is unlikely that either would have taken the stand and admitted to their own roles at the brothel in view of the fact that Morales already was under indictment for very much the same conduct. Had they been subpoenaed, they almost surely would have invoked the Fifth Amendment. In consequence, it is quite likely, and the Court finds, that Morales' counsel elected not to call either of these witnesses for an amalgam of all of these reasons, including unpersuasiveness, the questionable admissibility of the allegedly exculpatory testimony, the risk that the witnesses would have invoked the Fifth Amendment, and concern that the calling of these witnesses in the absence of Morales as a witness would have undermined rather than strengthened the defense.

### The Former Prostitutes

The facts concerning the former prostitutes at the brothel are largely set out in this Court's opinion denying Morales' motion for a new trial. Briefly stated, INS agents called to the brothel by City authorities on October 11, 1994 found and interviewed 31 Thai women, three of whom claimed to have been held against their will while the remainder declined to be questioned. In November, six of those women also claimed to have been held against their will and were removed from the brothel. Thus, by early November, a total of nine of the 31 inhabitants as of the October 11 raid claimed to have been held against their will.

In February 1995, following the institution of criminal proceedings, the government disclosed to the defense that (1) some of the women who had been at the brothel had

---

**2.** Defense counsel convincingly explained that he would have alerted the Court to the presence of any prospective witness to permit the Court to determine whether the exclude the witness. *See* Fed.R.Evid. 612.

admitted, contrary to their prior accounts, that they had come to the United States with the knowledge that they would work as prostitutes here, and (2) a raid on a Seattle, Washington, brothel had yielded three women who claimed they had come from New York and that they had not been held against their will here, although those three women had disappeared by the time the United States Attorney's office in this district learned of the Seattle events. In May 1995, during pretrial proceedings in this case, counsel for one of Morales' co-defendants stated that he had interviewed nine of the 31 New York women and that all of them had given exculpatory accounts, although it was not clear in what respect or with respect to whom the accounts were exculpatory.

Whatever the details, Morales and his counsel knew by May 11, 1995 that some of the 31 New York women might have had testimony exculpatory of Morales and that some of the alleged victims had changed their stories with respect to whether they had known prior to coming to this country that they would work as prostitutes here. Morales' counsel then asked the government to identify witnesses whom it did not intend to call on its case in chief. The government took the request as seeking the names of alleged victims to whom the government had access and whom it did not intend to call and supplied counsel with a list of seven women. Morales' trial counsel spoke to counsel for one of the seven, who stated that he would not permit his client to speak with counsel because the client was afraid of being deported or prosecuted. Trial counsel assumed that he would receive the same response from or on behalf of the other six women to whom the government had access and so made no effort to contact any of them or their attorneys. Nor did defense counsel make any effort to locate or speak to any of the other women who had been in the brothel.

There is little evidence as to what any or all of the 31 women would have said had they been located and called to testify. The Court does not credit Morales' claim that "counsel was told numerous girls at the brothel would testify for the defense," which in any case does not indicate what they would have said. Moreover, it is hardly clear that testimony which in some sense might have been characterized as being "for the defense" necessarily would have aided Morales in any material degree as is evident from testimony given by two of the 31 at a *Fatico* hearing held in connection with the sentencing of some of Morales' co-defendants long after Morales was convicted. Both testified that they were locked in the brothel and understood that they were not allowed to leave, although both admitted that they had agreed to work as prostitutes to work off their passage as opposed to having been tricked into doing so.[3] Inasmuch as the government acknowledged that only some of the women had been misled by promises of legitimate jobs,[4] the crux of the charges against Morales lay in his role in confining the women against their will in order to force them to work off their "debts" as prostitutes. Hence, testimony of the sort given at the *Fatico* hearing would not have helped Morales. Nevertheless, it is plain that counsel made precious little effort to find women who had been at the brothel or to learn what they had to say.

*Discussion*

### The Effectiveness of Counsel

■ In order to prevail on an ineffective assistance claim, one must demonstrate that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms" and "affirmatively prove prejudice" by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."[5] The Court "must indulge a strong presump-

---

**3.** One, Valaiborn Yeampunnai, said that she could not leave except in the company of her "boss," the smuggler who brought her into the country. The other, Kwanjai Hasubklong, said that she could not leave without the permission of the madam who ran the brothel. *Morales,* 916 F.Supp. at 338–39.

**4.** *Id.* at 338.

**5.** *Strickland v. Washington,* 466 U.S. 668, 687–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

tion that counsel's conduct falls within the wide range of reasonable professional assistance." [6] Moreover, actions or omissions by counsel that "might be considered sound trial strategy" do not constitute ineffective assistance.[7]

Measured by these principles, counsel's actions with respect to the former brothel employees, Freddy and Matthews, were unexceptionable and certainly well above the standard established by the first prong of *Strickland.* His decision not to call Freddy or Matthews was precisely the sort of tactical choice that may not be second-guessed by a claim of ineffective assistance of counsel.[8]

■ Counsel's failure to pursue the women who had been found at the brothel is another matter. As the Court observed in passing on Morales' new trial motion, "it was perfectly obvious from the outset of this case that testimony of women who had been at the brothel could be vitally important to one side or the other." [9] Perhaps witnesses could have been found among them who would have testified that Morales did not confine them against their will. But from the outset of the case, counsel made no serious effort to find out. Indeed, he was not bestirred until late in the day, when he obtained the list of seven women to whom the government had access and whom the government did not intend to call. And while the inference that none of them was likely to be helpful to the defense in light of their dependence on the government with respect to their desire to remain in the country probably was reasonable, particularly given the refusal by the lawyer for one of their number to allow defense counsel to speak to his client, this cannot justify the complete failure to pursue any of the others.

The Court recognizes that "there are countless ways to provide effective assistance in any given case; and that '[e]ven the best

criminal defense attorneys would not defend a particular client in the same way.' "[10] And it may well be that a search for these women would have been fruitless, that any women who were located would not have spoken to counsel, that any who would have spoken would not have given accounts favorable to the defendant, or that counsel responsibly would have decided not to call even women who would have given favorable testimony for entirely defensible reasons. But no serious effort was made to locate such witnesses.

■ Criminal defense counsel of course cannot always be faulted for failing to pursue every lead, no matter how unlikely of success or how demanding of scarce resources of time and money. Every criminal defense, like every lawsuit of any kind, requires counsel to make cost-benefit judgments concerning whether and to what extent to pursue potentially helpful evidence. In the ordinary case, the strong presumption that counsel's actions fell within the bounds of reasonable assistance and the broad protection afforded to tactical judgments will result in the conclusion that the defense did not fall below the constitutionally required minimum level of competence. Counsel's inaction here, though, poses a substantial question as to whether the defense in this one particular fell below that standard. It is unnecessary to decide that question, however, as Morales has not satisfied the second prong of the *Strickland* standard.

*Prejudice*

■ In assessing whether a more aggressive investigative effort by counsel probably would have led to a different result, two matters warrant close attention: the strength of Morales' showing that favorable evidence would have been discovered and the strength of the government's case against Morales, the latter of which bears on the

---

**6.** *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

**7.** *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

**8.** *See U.S. v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998).

**9.** *Morales,* 916 F.Supp. at 340.

**10.** *Aguirre,* 912 F.2d at 560 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

likelihood that such evidence, if it were found, would have yielded an acquittal.

### 1. Was There Favorable Evidence?

Morales' showing that women who had been at the brothel could have given testimony favorable to his case had they been located by counsel is exceptionally weak. His motion is not supported by an affidavit or other statement from any of these women as to what they would have said. We therefore are left with Morales' verified petition, the material that was before the Court on Morales' new trial motion, and a newspaper clipping submitted at the hearing.

Morales' petition is unenlightening as to the evidence potentially available, saying only that some of the women were willing to testify for the defense but failing to indicate what they were willing to say. The evidence before the Court on the new trial motion showed that two women from the brothel testified at a *Fatico* hearing in connection with the sentencing of co-defendants held after Morales was convicted said that they had agreed to work as prostitutes in the United States in exchange for being smuggled into the country, but said also that they were not allowed to leave the brothel freely.[11] There was a newspaper report before the Court on the new trial motion that unidentified Thai three women picked up in a raid on a brothel in Seattle after the New York brothel had been closed told Seattle authorities that they had been in a brothel in New York and had not been held there against their will.[12] In addition, a *Newday* article published in 1995 said that a woman who allegedly had been in the brothel—and who was identified only by a pseudonym because she wished to conceal her identity—had denied having been held against her will and said that the story had been fabricated to avoid having to pay the smugglers who brought the women into the country.[13] Finally, counsel for one of Morales' co-defendants told the Court prior to his client entering a guilty plea that he had interviewed nine women from the New York brothel who had given him exculpatory accounts,[14] although he did not say in what respect or with respect to which defendant or defendants their stories were exculpatory.

In considering the significance of this evidence—or, more properly, indications that more aggressive investigation might have yielded such evidence—it is important to focus on the specific charges against Morales. Morales and the others originally were charged with conspiracy to kidnap Thai women for the purpose of forcing them into prostitution in the United States and with the civil rights and importation for purposes of prostitution counts outlined above. The theory of the kidnapping conspiracy count was that at least some of the women smuggled into the country were tricked into believing that they would engage in legitimate employment here and thus earn the money needed to pay off their smugglers,[15] so the pivotal issue on the kidnapping conspiracy charge thus was whether women were deceived as to the nature of their employment once they entered the United States. The civil rights counts turned principally on whether women were confined against their will. The importation counts depended in the main upon the defendants' knowledge that the alien women were imported and transported for the purpose of prostitution.

In these circumstances, evidence that women from the brothel willingly came to this country to engage in prostitution would have been highly exculpatory on the kidnapping conspiracy count. While Morales was convicted on that count, the government consented to his Rule 29 motion addressed to that charge.[16] The failure of counsel to obtain evidence that women from the brothel came to this country for the purpose of engaging prostitution therefore ultimately proved harmless to Morales.

---

**11.** *Morales*, 916 F.Supp. at 338–39.

**12.** *Id.* at 340.

**13.** DX D.

**14.** *Id.*

**15.** *Morales*, 916 F.Supp. at 338.

**16.** *Id.* at 337.

Given the present posture of the case, what might have been important to Morales was evidence that women were not kept in the brothel against their will or that Morales was ignorant of the fact that they were aliens or that they were harbored or transported for the purpose of prostitution. But the record before the Court does not support the view that more aggressive investigation would have produced any such evidence.

The only indications that any of the women from the brothel could have testified that they were not kept against their will was the article that followed the raid on the Seattle brothel and the *Newsday* article. As the Court's opinion denying a new trial indicates, the three women who reportedly made such statements to Seattle authorities had disappeared by the time the article came to the attention of the defense in this case.[17] It is far from clear that the woman who spoke to *Newsday* could have been located. Hence, the Court is asked to infer that had defense counsel pursued the women who remained in touch with the prosecution or others of the original 31, he would have come up with at least one who would have given such testimony. The evidence at the *Fatico* hearing, however, demonstrates that at least two of the seven women who remained in touch with the government by the time of trial claimed that they were held against their will. In any case, the evidence is insufficient to warrant a finding that a more diligent investigation by counsel would have produced even a single witness prepared to say that she was not held against her will. And even Morales does not contend that any of the women would have supported his contention that Morales did not know that the women were aliens or that they had been transported and harbored for the purpose of prostitution.

### 2. *Would It Have Mattered?*

The case against Morales on the civil rights and importation and harboring counts was strong. The government relied principally on the testimony of Siew Geok Adkins,

a/k/a Lilly Chan, the madam of the brothel; Jawarit Sillaphanond, a/k/a Lek, one of the Thai smugglers; and Sonchay Khounsavanh, a customer of the brothel who later worked there briefly, all of whom gave testimony extremely damaging to Morales.[18] In addition, the government played a tape of a conversation between Morales and Khounsavanh that clearly indicated that Morales knew that women were held against their will. At one point in the conversation, Morales said to Khounsavanh: "Don't forget remember that one girl that got away first,"[19] obviously a reference to an escape by one of the captives. Shortly thereafter, Morales said:

"Well let me tell you. I'm surprised they did that to her man. You know, some tirls wanted to leave. I use to tell Jenny all the time Sam, that she gotta give these girls their freedom. Let them go and come as they want, like they want to. I said because she kept, you know, you can't be, she never wanted to let nobody go outside, and I told her Jenny listen, you gonna get a, you gonna have a lot of problems, man. These girls are, they talking, you know."[20]

Thus, the evidence of petitioner's knowledge of and complicity in the unlawful imprisonment of these women was overwhelming.

Where then would Morales have been if counsel had found one or even a number of women who claimed that they had not been held against their will?

The first hurdle would have been to persuade them to testify to those facts, which would not have been easy given their desire to remain in the United States and thus to avoid being found by the Immigration and Naturalization Service or offending federal authorities. Those concerns led counsel for one of the women to refuse to allow Morales' counsel to interview his client and were responsible for the woman interviewed by *Newsday* identifying herself only by a false name.

---

**17.** *Id.* at 340.

**18.** It called only one of the women, Sunan Chalremsen, and Chalremsen's testimony simply was not very harmful to petitioner's case.

**19.** GX 6A, at 14.

**20.** *Id.* at 17.

The next issue would have been whether counsel would have called the witness or witnesses. Defense counsel testified at the hearing that once petitioner changed his mind and decided not to take the stand, he would not have called witnesses for fear that doing so would have undermined the defense's reliance on its right not to call evidence, called even greater attention to petitioner's failure to testify, and prejudiced the defense overall.[21] And while Morales' counsel did not make the point at the hearing, calling any of the women from the brothel would have entailed the risk that the government would have called other women as rebuttal witnesses to testify that they indeed had been held against their will. Thus, there is substantial reason to believe that defense counsel would not have called any such witnesses even if he had found them and had them sitting in the witness room.

Even assuming that such witnesses had been found and had testified, it is unlikely that the trial would have ended with the testimony of witnesses favorable to Morales. We know from the *Fatico* hearing that the government had at least two women from the brothel who ultimately testified that they were not allowed to leave the brothel. They doubtless would have testified in rebuttal and contradicted any witnesses favorable to Morales on the illegal restraint issue. The state of the evidence at the conclusion of the trial therefore would have been that the government's three cooperating witnesses all would have inculpated Morales, the tape of the Morales–Khoounsavanh conversation would have supported the government's position strongly, there would have been a split among women from the brothel as to whether they had been held against their will, and Morales would not have testified.

### 3. Synthesis

In order to satisfy the second prong of *Strickland*, Morales must establish that, but for counsel's failure more aggressively to pursue the women from the brothel, "there is a reasonable probability that ... the result of the proceedings would have been different."[22] In other words, the Court is obliged to determine the probable outcome had counsel approached the defense in a different way, a problem made quite difficult by the fact that the result would have depended upon so many different contingencies.

The Second Circuit recently has given quite helpful guidance in dealing with such problems in deciding an analogous issue, whether evidence improperly found and seized without a warrant nevertheless is admissible because its lawful discovery was inevitable. In *United States v. Cabassa*,[23] the Court rejected a government inevitable discovery claim on the ground that lawful discovery simply was too uncertain to justify receipt of the evidence. In doing so, it made clear that relevant factors included (1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search,"[24] (2) the strength of the showing of probable cause at the time the entry occurred,[25] (3) whether a warrant ultimately was obtained, albeit after the illegal entry,[26] and (4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."[27] The status of the application process, it said, is an important factor because it relates both to "whether a warrant would in fact have issued" and "whether the same evidence would have been discovered pursuant to the warrant" before being destroyed or removed from the location.[28] It reasoned that discovery was not inevitable on the facts before it in view of the debatable strength of the showing of probable cause, the failure ultimately to obtain a warrant, the preliminary state of the warrant application, and the inability to forecast

---

21. Tr. 28–29.

22. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

23. 62 F.3d 470 (2d Cir.1995).

24. *Id.* at 473.

25. *Id.*

26. *Id.*

27. *Id.* n. 2.

28. *Id.* at 473.

whether the warrant would have been obtained, if at all, while the evidence still was present.[29] It concluded by observing that "[a]t best, the government's showing in the instant matter would support separate findings that more probably than not a warrant would eventually have issued and that more probably than not the evidence would have been [in the same place] when a lawful search occurred. Either of these findings is susceptible to factual error ... and the combined chance of error undermines the conclusion that discovery of the evidence pursuant to a lawful search was inevitable."[30] It went on to point out, in a reference to probability theory, that there are "semantic problems" in using the preponderance of the evidence standard to prove inevitability because proof of several independent factors, each by a preponderance of the evidence but each necessary to the conclusion that the evidence actually would have been discovered lawfully, could result in receiving illegally seized evidence where there is less than a 50 percent chance of the evidence being discovered independently.[31]

The teaching of *Cabassa*, which is supported by principles of probability, thus is straightforward. It suggests that a trial court's task in passing on an inevitable discovery claim is to deny the motion to suppress on the ground of inevitable discovery only if it has a high level of confidence that the warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means. Inevit-

able discovery analysis therefore requires a court to examine each of the contingencies that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred. In warrantless search questions, it requires consideration of whether a warrant would have been sought,[32] whether a warrant would have issued, whether the warrant would have specified the articles seized, whether the articles would have remained in place by the time the warrant would have been executed,[33] and whether the articles would have been found in the hypothetical warranted search, perhaps among other variables. The more contingencies there are, and the lower the probability that each would have been resolved in the government's favor, the lower the probability that the evidence would have been found by lawful means.[34]

So too here. In order for a more aggressive approach by Morales' counsel to have resulted in a different outcome, many contingencies would have had to have been resolved in Morales' favor. Would counsel have found any of the women? Would they have spoken to him? What would they have said? If their accounts were favorable, would they have been willing to testify in open court to the facts that they were prepared to confide privately to counsel? Would such testimony have prompted a government rebuttal? Would the testimony have been

29. *Id.* at 474.

30. *Id.* at 474.

31. *Id.*

Under established principles of probability theory, the probability that both of two independent events will occur is the product of the probability of each. Put differently, if P(A) is the probability of the occurrence of event A and P(B) is the probability of the occurrence of event B, and if the occurrence of A is independent of the occurrence of event B, then the probability of the occurrence of both event A and event B is the product of the probabilities of the occurrence of each, or P(A & B) ≠ P(A)P(B). *United States v. Lavan*, 10 F.Supp.2d 377, 389 n. 60 (S.D.N.Y.1998) (citing Taro Yamane, Statistics: An Introductory Analysis § 5.7, at 107–10 (2d ed.1967)). Thus, if it

is barely more probable than not (e.g., 51 percent likely) that a warrant will issue and barely more probable than not that not that the evidence still will exist and be found after issuance of the warrant, the probability of finding the evidence pursuant to a warrant is 26.01 percent.

32. *See U.S. v. Eggers*, 21 F.Supp.2d 261, 272 (S.D.N.Y. 1998) (referring to uncertainty as to whether agents would have sought a warrant at all).

33. *See id.* (referring to uncertainty as to whether evidence would have remained in an unguarded house to which others may have had access for the day or more that would have been required to obtain and execute a warrant).

34. *Lavan*, 10 F.Supp.2d at 389.

persuasive to the jury in light of the other evidence against Morales? The uncertainties are far too many, and their prospects for resolution in Morales' favor are sufficiently low, that the Court is quite comfortable in finding that Morales has failed to establish that more diligent investigation by counsel probably would have resulted in an acquittal.

### Conclusion

For the foregoing reasons, the motion for relief under Section 2255 is denied in all respects. Given the low threshold for doing so, the Court grants a certificate of appealability with respect to the question whether Morales was deprived of the effective assistance of counsel by his trial counsel's failure more diligently to pursue the possibility of testimony favorable to Morales from women who had been at the brothel and denies a certificate of appealability in all other respects.

SO ORDERED.